ALLAN DOCKSTEINER, Appellant, v. THE INDUSTRIAL COMMISSION *et al*. (Peabody Coal Company, Appellee).

Fifth District (Industrial Commission Division)  No. 5—03—0150WC

Opinion filed February 20, 2004.—Rehearing denied April 6, 2004.

GOLDENHERSH, J., dissenting, joined by HOLDRIDGE, J.

Culley & Wissore, of Raleigh (Harold B. Culley, of counsel), for appellant.

Kevin M. Hazlett, of Swansea, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The claimant, Allan Docksteiner, appeals from an order of the circuit court confirming a decision of the Industrial Commission (Commission) to deny him benefits under the Workers' Occupational Diseases Act (Act) (820 ILCS 310/1 *et seq.* (West 1996)), which he sought for having allegedly contracted coal workers' pneumoconiosis (CWP) while in the employ of Peabody Coal Company (Peabody). For the reasons that follow, we affirm.

The following factual recitation is taken from the evidence presented at the arbitration hearing.

The claimant worked as a coal miner for approximately 25 years during which time he was exposed to, and breathed, coal mine dust. According to the claimant, he bid for a "top job" in 1971 because he was having trouble breathing. He stated that he was coughing, spitting up, and experiencing shortness of breath.

The claimant testified that, while working as a miner, he sought treatment for his breathing problems with his family physician, Dr. Larry Jones, but could not remember precisely when that treatment began. The claimant stated that Dr. Jones prescribed a walking regimen. He admitted, however, that Dr. Jones did not prescribe any medication for his alleged breathing problems. Dr. Jones's records for the period from 1980 through 1996 were introduced into evidence by Peabody. Those records do not reflect any treatment for chronic pulmonary complaints. Rather, as the Commission observed, Dr. Jones's office notes for visits by the claimant from 1981 through 1996 repeatedly contain the notation "Lungs are clear."

The claimant was employed by Peabody at its Eagle No. 2 mine. On July 12, 1993, Peabody closed that mine and the claimant has not worked as a miner since. The claimant testified that he was experiencing difficulty breathing when he last worked as a miner.

At the suggestion of his attorney, the claimant saw Dr. William Houser, a board-certified pulmonary specialist. Dr. Houser examined

the claimant on only one occasion, January 7, 1997. On that date, Dr. Houser ordered X rays taken of the claimant's chest. The radiologist who interpreted those X rays, Dr. Sam Baker, noted small rounded opacities in the mid and lower lung zones consistent with pneumoconiosis. At his evidence deposition, Dr. Houser testified that he diagnosed the claimant as suffering from CWP, category 1/1; mild chronic obstructive pulmonary disease (COPD); hypertension; arteriosclerotic heart disease; status post-myocardial infarction; diabetes mellitus; hypercholesterolemia; and degenerative arthritis. He opined that the claimant suffered occupational exposure to coal dust for approximately 25 years and that the claimant's CWP is related to his employment as a coal miner. Dr. Houser testified that, since the claimant suffers from CWP and COPD, he should avoid any additional exposure to coal and rock dust. According to Dr. Houser, the claimant's CWP would have been present when he left mining.

On March 4, 1997, the claimant filed an application for adjustment of claim under the Act asserting that he suffered "Shortness of Breath & Exercise Intolerance" as a consequence of the "[i]nhallation of coal mine dust including but not limited to coal dust, rock dust, fumes & vapors for a period in excess of 25 years."

At the request of the attorneys representing Peabody, the claimant's chest X ray taken on January 7, 1997, was reviewed by Dr. Jerome Wiot, a professor of radiology at the University of Cincinnati. In a letter dated January 26, 1998, Dr. Wiot reported that:

> "There is no evidence of coal worker's pneumoconiosis. This patient has atherosclerotic change in the thoracic aorta, but the chest is otherwise unremarkable."

Dr. Peter G. Tuteur, a physician board certified in internal medicine and pulmonary disease, examined the claimant on July 14, 1998, at the request of Peabody. On that date, Dr. Tuteur ordered an X ray of the claimant's chest, a CT scan, and a pulmonary function study. A report of the CT scan written by Dr. Richard Slone states that no interstitial lung disease was seen on the images. A report of the claimant's chest X ray written by Dr. Harvey Glazer states that minimal linear atelectasis was noted in the left base and that the lungs were otherwise clear. Dr. Tuteur testified that, in addition to the radiologists, he interpreted both the chest X ray and CT scan. He stated that, based upon his examination of the claimant, his review of the claimant's chest X ray and CT scan and the results of the pulmonary function study, there was "no physiologically significant or radiographically significant pulmonary process." According to Dr. Tuteur, the claimant "does not have radiographically significant coal workers' pneumoconiosis." In his written report, Dr. Tuteur noted

that, although the claimant is "clearly disabled from returning to work in the coal mines, this disability is in no way related in whole or in part to his coal mine dust exposure."

On February 9, 2000, Dr. Michael S. Alexander, a physician board certified in diagnostic radiology and a certified pneumoconiosis B reader, reviewed the claimant's January 7, 1997, chest X ray. Dr. Alexander issued a report in which he recorded an impression of: CWP, category p/q, 1/1, pi; and bilateral chest wall pleural thickening (mild).

Approximately one year prior to the arbitration hearing, the claimant suffered a stroke. During the hearing, the claimant testified that, in addition to his breathing problems, he suffers from diabetes, high blood pressure, and depression.

Following the hearing, the arbitrator issued a decision in which he found Dr. Houser to be the most credible medical witness. The arbitrator also found, *inter alia*, that: the claimant was regularly exposed to coal dust while in the employ of Peabody; the claimant suffers from CWP; the claimant is entitled to the statutory presumption that his CWP arose out of his employment (see 820 ILCS 310/1(d) (West 1996)); the claimant's occupational disease caused disablement within two years of his last exposure; the claimant gave Peabody adequate notice of his claimed occupational disease; and the claimant timely filed his application for adjustment of claim. The arbitrator concluded that the claimant is permanently disabled to the extent of 20% of a "person as a whole" and awarded him benefits in the sum of $384.73 per week for a period of 100 weeks pursuant to section 8(d)2 of the Workers' Compensation Act (820 ILCS 305/8(d)2 (West 1996)). See 820 ILCS 310/7 (West 1996).

Both the claimant and Peabody sought a review of the arbitrator's decision before the Commission. The Commission reversed the arbitrator's decision and denied the claimant any benefits under the Act, finding that he failed to prove disablement as a result of an occupational disease within two years of his last date of exposure as required by section 1(f) of the Act (820 ILCS 310/1(f) (West 1996)). In its decision, the Commission specifically relied upon Dr. Tuteur's opinion that the claimant is not suffering from CWP. The Commission found Dr. Houser's opinion that the claimant suffered from CWP on his last day of work to be speculative and not supported by the medical evidence.

The claimant sought judicial review of the Commission's decision in the circuit court of Gallatin County. The circuit court confirmed the Commission's decision, finding that it was not against the manifest weight of the evidence, and this appeal followed.

■ On an evidentiary point, the claimant argues that the Commis-

sion erred in considering the results of his CT scan. The claimant asserts that "[p]art of the Commission's reason for reversing the arbitrator was its consideration of the CT scan performed at the request of Dr. Tuteur." According to the claimant, since Dr. Tuteur did not testify that a CT scan is the type of data customarily used by physicians to diagnose CWP, his testimony concerning the CT scan should not have been considered by the Commission. We disagree.

The claimant's objection to the Commission's consideration of Dr. Tuteur's testimony concerning the results of the CT scan appears to be based upon a lack of foundation. However, the claimant interposed no such objection either during Dr. Tuteur's evidence deposition or before the arbitrator. It is true that the claimant objected to the introduction into evidence of Dr. Slone's written report on hearsay grounds, an objection that was overruled by the arbitrator, but he never objected to Dr. Tuteur's reliance upon the CT scan in formulating his opinions. When Peabody's attorney moved the admission into evidence of several documents, including Dr. Tuteur's three-page written report dated July 14, 1998, Dr. Slone's written report of the claimant's CT scan, Dr. Glazer's written report of the claimant's chest X ray and the report of the claimant's pulmonary function study, the claimant's attorney interposed a hearsay objection. Almost immediately thereafter he clarified the objection by stating:

"MR. WISSORE: At this time I want to make my objection to the attachment of the CT report [Dr. Slone's report] and the x-ray report [Dr. Glazer's report] and the basis of my objection is hearsay and I have no objection to the remainder, the PFT's [pulmonary function test] or the narrative report [Dr. Tuteur's written report]."

The claimant's attorney never objected to Dr. Tuteur's testimony regarding his independent interpretation of the CT scan or his reliance upon the CT scan in formulating his opinion that the claimant does not suffer from CWP. Dr. Tuteur's written report, which was admitted into evidence without objection from the claimant, specifically states:

"CT scan of the thorax was performed and included high resolution cuts. There is no evidence whatsoever of any interstitial pulmonary process. There is no evidence of coal workers' pneumoconiosis."

Having failed to object during Dr. Tuteur's evidence deposition or during the arbitration hearing, the claimant has waived any objection to the Commission's consideration of Dr. Tuteur's testimony regarding his interpretation of the CT scan or his reliance thereon in formulating his opinion that the claimant does not suffer from CWP. *Caradco Window & Door v. Industrial Comm'n*, 86 Ill. 2d 92, 97, 427 N.E.2d 81 (1981).

■ Next, the claimant contends that section 1(f) of the Act (820 ILCS 310/1(f) (West 1996)), which provides that no compensation shall be payable on account of any occupational disease unless disablement occurs within two years after the last exposure, is inapplicable to CWP claims. The claimant argues that section 1(f) conflicts with section 6(c) of the Act (820 ILCS 310/6(c) (West 1996)), which gives a miner five years after his last exposure to file an application for compensation based upon a disability caused by CWP. He asserts that "[i]t makes little sense to give a claimant five (5) years to file his claim, but to bar it if he proves no disablement within two (2) years." According to the claimant, section 1(f) must be read in light of section 6(c) and limited to claims which have a "compatible limitations period." However, the identical argument was made to this court and rejected in *Plasters v. Industrial Comm'n*, 246 Ill. App. 3d 1, 615 N.E.2d 1145 (1993). See also *Forsythe v. Industrial Comm'n*, 263 Ill. App. 3d 463, 468-69, 636 N.E.2d 56 (1994).

In *Plasters*, we held that sections 1(f) and 6(c) should be read together to effectuate the legislative intent. The subject matter of each provision is different. Compliance with section 1(f) is a condition precedent to recovery; whereas, section 6(c) is a statute of limitations. *Plasters*, 246 Ill. App. 3d at 7-8. As we noted in *Plasters*, "the fact that a claimant must become disabled from an occupational disease within two years after his last exposure but has three more years to file a claim allows the claimant time to prepare for any administrative or legal action he may decide to take." *Plasters*, 246 Ill. App. 3d at 7-8. Simply put, there is no conflict between sections 1(f) and 6(c) of the Act, and section 1(f) is applicable to claims based upon CWP. *Plasters*, 246 Ill. App. 3d at 8; *Forsythe*, 263 Ill. App. 3d at 468-69.

Finally, the claimant asserts that the Commission's finding that he failed to prove disablement due to an occupational disease within two years of the date of his last exposure as required by section 1(f) of the Act is against the manifest weight of the evidence. In support of his contention in this regard, the claimant argues that the Commission erred when it: (1) characterized Dr. Houser's testimony concerning timely disablement as "speculative at best, and therefore not entitled to any weight"; and (2) relied upon Dr. Jones's records to reject Dr. Houser's opinions.

■ It is the function of the Commission to decide questions of fact, judge the credibility of witnesses, and resolve conflicting medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253, 403 N.E.2d 221 (1980). The Commission's determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. *Orsini v. Industrial Comm'n*, 117 Ill. 2d 38, 44, 509

N.E.2d 1005 (1987). For a finding of fact to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Caterpillar, Inc. v. Industrial Comm'n*, 228 Ill. App. 3d 288, 291, 591 N.E.2d 894 (1992).

■ In this case, the Commission considered, among other evidence, the opinions of Dr. Houser, Dr. Jones's medical records, the conflicting interpretations of the claimant's January 7, 1997, chest X ray by Drs. Alexander and Wiot, and the opinions of Dr. Tuteur. The Commission resolved the conflicting medical evidence by relying upon the opinions of Dr. Tuteur to the effect that the claimant is not suffering from CWP and, therefore, could not have been disabled as a result of CWP during the two years following his last exposure to coal dust. Although we might not have reached the same conclusion as the Commission, we cannot say that its decision is against the manifest weight of the evidence.

For the foregoing reasons, we affirm the circuit court's order confirming the Commission's decision.

Affirmed.

McCULLOUGH, P.J., and CALLUM, J., concur.

JUSTICE GOLDENHERSH, dissenting:
I respectfully dissent.

The basic lynchpin in this case, as reflected by the decision of both the Industrial Commission (Commission) and the majority in this appeal, is the reliance on Dr. Peter Tuteur's conclusions concerning lack of any coal worker's pneumoconiosis (CWP) and, more specifically, the basis of this conclusion, his use and reliance upon his reading of a CT scan. On the basis partially of Dr. Jones's notes indicating numerous visits with findings of claimant's lungs being clear and Dr. Tuteur's testimony, the Commission determined that Dr. Houser's testimony was "not supported by the medical evidence taken as a whole and is speculative at best." This conclusion ignores the findings of Dr. Houser from his X-ray analysis and the finding of Dr. Houser's radiologist, a qualified B reader, and relies instead upon Dr. Tuteur's conclusion based upon his reading of CT scans. Since there are no standards for such readings of CT scans, as Dr. Tuteur admits, and evidence exists in the record that a finding of clear lungs could be found with stages of CWP, the conclusion of the Commission is speculative, not Dr. Houser's.

Dr. Houser testified that based upon his reading of the X rays and that of his radiologist, a qualified B reader, and the nature of CWP as

a chronic and progressive disease, claimant had CWP and had it at the time of his last employment by respondent. The fact that Dr. Houser's examination occurred 3½ years after the mine closed would not defeat this diagnosis. Dr. Houser also testified, and Dr. Tuteur admits, that there are no standards in existence for use of CT scans to diagnose CWP and that there are no recognized criteria for using such scans to determine the accuracy of competing X-ray interpretations, as we find in this case. (Dr. Wiot read the X rays and came to the conclusion that claimant did not have CWP.) X rays, in contrast to CT scans, are diagnosed by comparison with International Labor Organization standard X-ray films, and in this case, it was done by a qualified B reader. This type of analysis is, by its nature, objective and one using objective standards. Dr. Tuteur admitted that there are no standards for reading CT scans as there are for X rays in determining CWP; there is, therefore, a greater application of subjective judgment as opposed to objective comparison and analysis of X rays.

The majority frames the question of Dr. Tuteur's reliance on CT scans in terms of an evidentiary question, specifically admissibility. While I have no quarrel with the majority's conclusion on this point, this analysis fails to deal with a more serious question: whether the Commission's reliance on Dr. Tuteur's opinion, essentially grounded on his CT readings for which there are no objective standards, is an appropriate basis for its findings when the competing evidence is based on X-ray analysis and B reader conclusions. The Commission, in effect, relied on subjective readings of a CT scan without recognized objective standards over objective interpretation of X rays by B readers and physicians using objective standards. The Commission claims that the latter's conclusions were speculative. In reality, the Commission's findings were speculative and against the manifest weight of the evidence. This speculation contrary to the manifest weight of the evidence infected both the Commission's findings as to the existence of CWP and the question of its existence within the two-year statutory period.

The rebuttable presumption that a miner's pneumoconiosis arose from his employment if he was employed for 10 years or more in the mines (820 ILCS 310/1(d) (West 1996)) was not rebutted in this case. Likewise, disablement, defined as impairment or partial impairment of the body or being rendered unable to earn full wages in the occupation in which claimant worked when last exposed to the hazards of the occupational disease (820 ILCS 310/1(e) (West 1996)), was shown by the objectively reliable evidence in this case. As noted above, the Commission's finding to the contrary was against the manifest weight of the evidence.

While Dr. Houser's examination occurred approximately 3½ years after claimant's last exposure to coal dust, this lapse of time is immaterial in a situation such as this. As noted in this record and consistently noted in opinions by this court (*Zeigler Coal Co. v. Industrial Comm'n*, 237 Ill. App. 3d 213, 604 N.E.2d 481 (1992); *Monterey Coal Co. v. Industrial Comm'n*, 241 Ill. App. 3d 386, 609 N.E.2d 339 (1992)), CWP is a chronic, slowly progressive lung disease. The finding of the Commission that there was no disablement, given the nature of CWP, is contrary to the manifest weight of the evidence, especially considering the Commission's reliance on Dr. Tuteur's opinions.

Given that the Commission's findings are based on Dr. Tuteur's conclusions, which in turn are based on CT scan reading without objective standards versus Dr. Houser's and his B reader's reading of chest X rays with objective standards, the Commission's decision was against the manifest weight of the evidence. The Commission chose to rely on essentially subjective conclusions, readings without objective standards and subject to subjective interpretations, as opposed to objective analysis based on internationally promulgated objective standards and, accordingly, reached a decision contrary to the manifest weight of the evidence and contrary to law. The arbitrator's analysis of the instant case was correct, and I would reinstate his decision.

HOLDRIDGE, J., joins in this dissent.