# Illinois Official Reports

***Swanson v. Board of Trustees of the Flossmoor Police Pension Fund*,
2014 IL App (1st) 130561**

| | |
|---|---|
| Appellate Court Caption | MARK E. SWANSON, Plaintiff-Appellant, v. THE BOARD OF TRUSTEES OF THE FLOSSMOOR POLICE PENSION FUND, Defendant-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-13-0561 |
| Filed | March 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of plaintiff's application for a line-of-duty pension for the disability he suffered as a result of a stroke was not against the manifest weight of the evidence, since plaintiff failed to present sufficient proof that the stroke was the result of his performance of an act of duty as a police officer. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-40021; the Hon. Diane J. Larsen, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Nicholas F. Esposito, Bradley K. Staubus, and Delia DiVenere, all of Esposito & Staubus LLP, of Burr Ridge, for appellant.<br><br>Richard J. Reimer, Keith A. Karlson, and Christopher M. Melnyczenko, all of Reimer & Karlson LLC, of Hinsdale, for appellee. |

| Panel | JUSTICE HOFFMAN delivered the judgment of the court, with opinion.
Presiding Justice Connors and Justice Cunningham concurred in the judgment and opinion. |

**OPINION**

¶ 1    The plaintiff, Mark E. Swanson, appeals from an order of the circuit court which confirmed a decision of the Board of Trustees of the Flossmoor Police Pension Fund (the Board) denying his application for a line-of-duty disability pension under section 3-114.1 of the Illinois Pension Code (Code) (40 ILCS 5/3-114.1 (West 2008)) or, in the alternative, by reason of a stroke he suffered in the performance of his duties as a police officer under section 3-114.3 of the Code (40 ILCS 5/3-114.3 (West 2008)). For the reasons that follow, we affirm the judgment of the circuit court.

¶ 2    The following factual recitation is taken from the evidence of record presented at the Board's hearing on the plaintiff's application for pension benefits conducted on February 23, 2011, and July 12, 2011.

¶ 3    The plaintiff became a member of the Flossmoor police department (Department) on January 3, 2000. Following his appointment to the Department, he was assigned to the patrol division. In 2007, the plaintiff was promoted to the rank of detective and assigned to the detective division.

¶ 4    According to the plaintiff, he did not sleep well on the night of July 30, 2009, because he was upset and angry over a performance evaluation he had received at work. In the morning of July 31, 2009, the plaintiff left his home to go to work, but returned shortly thereafter. He testified that his arm was numb from the elbow down and his lip was drooping. Dawn Swanson, the plaintiff's wife, testified that, when the plaintiff returned home, she noticed that his mouth was droopy and his speech was slurred. She drove the plaintiff to Palos Community Hospital (Hospital), where he was seen in the emergency room complaining of right-sided weakness and tingling and exhibiting slurred speech. While in the emergency room, the plaintiff underwent a number of diagnostic tests. He was admitted to the Hospital with a diagnosis of having suffered a transient ischemic attack (TIA). The initial assessment of the plaintiff was uncontrolled hypertension, secondary to noncompliance; and a TIA. The plaintiff remained a patient at the Hospital until his discharge on August 2, 2009. At the time of discharge, the plaintiff's principal diagnosis was an unspecified cerebral arterial occlusion with cerebral infarction, and his secondary diagnosis was hypertension.

¶ 5    The plaintiff testified that, prior to July 31, 2009, he had suffered headaches, but they were not a "chronic problem." The plaintiff's medical records reflect that, from 2005 through July 31, 2009, he had been seen by a number of physicians and their assistants and treated for hypertension and hypercholesterolemia. During that period, the plaintiff was prescribed medication for his elevated blood pressure, which he took irregularly, and advised to control his diet and exercise. On June 12, 2008, the plaintiff was seen by a physician's assistant, Melissa Schultz, complaining of dizziness and light-headedness. Schultz's notes of that visit

reflect that the plaintiff had a history of hypertension and obesity, and that he was noncompliant with his medications. On January 30, 2009, the plaintiff was seen by Dr. Mary Anne Damiani, complaining of headaches. Her diagnosis on that date was tension cephalgia, hypertension, and obesity. On June 2, 2009, the plaintiff underwent a stress test, the report of which states that he suffered from accelerated hypertension. The plaintiff testified that he experienced numbness in his cheek, leg, and arm while working on June 25, 2009. He stated that, prior to that date, he had never experienced any stroke-like symptoms.

¶ 6 Following his hospitalization, the plaintiff was treated by Dr. Karen Spurgash, a cardiologist, and Dr. Fraterno Lemus, a neurologist. He was released to return to full duty as a police officer as of August 19, 2009.

¶ 7 The plaintiff testified that, while working on September 23, 2009, he experienced chest palpitations and tingling in his hand when he responded to a radio call of a domestic disturbance. After determining that his assistance at the scene of the occurrence was not needed, the plaintiff went back to the police station to participate in a class for the Citizen Police Academy. Upon arriving, the plaintiff just sat down and relaxed. There is no evidence in the record that the plaintiff ever reported this incident to his superiors or sought medical treatment that day.

¶ 8 The plaintiff testified to two other events which occurred between September 23 and September 30, 2009. The first incident involved light-headedness which he experienced while working. According to the plaintiff when he felt light-headed, he went to the fire department and had a paramedic take his blood pressure. His blood pressure registered 140 over 90. The second event occurred on September 28, 2009. The plaintiff stated that he experienced anxiety when he was not assigned to assist in the investigation of a young women found sitting in her own urine with a cord wrapped around her neck.

¶ 9 On September 30, 2009, the plaintiff was assigned to attend a mandatory training class on civil litigation involving police officers that was being conducted at the Tinley Park Library. According to the plaintiff, he arrived for the class at 8 a.m., feeling "okay." During a break in the class, the plaintiff had a conversation with his superior, Sergeant Hundley, concerning a home invasion that occurred the night before. According to Sergeant Hundley, the plaintiff seemed "upset" that he had not been called to investigate the incident. The plaintiff testified that he became light-headed and started to experience a tingling in his arm during the conversation. He stated that, when the break ended, he walked back to class and sat down next to Sergeant Hundley. Sergeant Hundley testified that the plaintiff leaned over and said that he was not feeling well and that he was experiencing numbness and tingling in his arm. According to Sergeant Hundley, he told the plaintiff: "That's not good. You should probably contact your doctor." The plaintiff asked to see Sergeant Hundley outside of class, but Sergeant Hundley did not exit the classroom until the instructor announced another break. During the second break is when, according to the plaintiff, he told Sergeant Hundley that he was "not feeling right" and that he was experiencing "some light-headedness and some tingling." According to the plaintiff, Sergeant Hundley suggested that he should go home. The plaintiff testified that he left the classroom and called Dr. Spurgash and reported his symptoms to her. Dr. Spurgash told the plaintiff to go to the emergency room immediately. The plaintiff informed Deputy Chief Mike Pulec that he was not feeling well and that his doctor had advised him to go to the emergency room. Deputy Chief Pulec then drove the plaintiff to the emergency room. Deputy Chief Pulec testified that, during the ride to the Hospital, he did not notice the plaintiff

exhibiting any slurred speech or tremors. He remained with the plaintiff at the emergency room until the plaintiff's wife arrived.

¶ 10    The emergency room record states that the plaintiff arrived on September 30, 2009, at approximately noon, complaining of tingling in his right upper extremity and weakness. Following a physical examination and diagnostic testing, the attending emergency-room physician diagnosed a TIA and hypertension and admitted the plaintiff to the Hospital. The plaintiff remained in the Hospital until October 1, 2009, when he was discharged with instructions to follow up with the "Sleep Center" for suspected sleep apnea.

¶ 11    The plaintiff was examined at the Center For Sleep Medicine. A report of that examination dated October 6, 2009, states that the plaintiff had moderate sleep apnea associated with severe oxygen desaturation.

¶ 12    Following the events of September 30, 2009, the Department placed the plaintiff on medical leave under the Family and Medical Leave Act (FMLA) (5 U.S.C. § 6381 *et seq.* (2006)). He remained on medical leave until December 9, 2009, when his FMLA benefits expired. During that period of time, the plaintiff was seen at the Loyola University Medical Center and came under the care of a variety of physicians. In a progress note dated October 15, 2009, Dr. Mark Alberts wrote that the mechanism of the plaintiff's "stroke is of unclear etiology."

¶ 13    With the expiration of his FMLA benefits, the plaintiff was advised that he would have to return to full-time duties as a patrolman or resign from the Department. On December 17, 2009, Dr. Michael Schneck, the plaintiff's treating physician, noted that the plaintiff suffered from mild dysphonic moods and numbness in his right hand that "did not preclude him from returning to work, effective immediately."

¶ 14    On December 19, 2009, the plaintiff was seen at the Loyola University Medical Center emergency room, complaining of tingling in his right forearm and cheek, weakness in his right leg, and difficulty expressing himself. He also reported feeling depressed. The plaintiff was admitted to the hospital with acute anxiety and depression. While hospitalized, he gave a history of being under emotional stress since he was told that he might have to resign from his position as a police officer and reported having experienced crying spells, trouble sleeping and a loss of appetite for the prior two weeks. Dr. Mueller diagnosed the plaintiff as suffering from anxiety and depression.

¶ 15    On December 22, 2009, Dr. Schneck authored a note stating that the plaintiff had ongoing, intermittent paresthesias and numbness of the right hand and that his condition prevented him from working. On referral from Dr. Schneck, the plaintiff was seen on December 29, 2009, by Dr. Edwin Mersch for a psychological evaluation. The plaintiff reported that he was depressed, emotional and irritable because he might be forced to resign from the Department. Dr. Mersch diagnosed the plaintiff as suffering from a "major depressive disorder."

¶ 16    On December 29, 2009, the plaintiff filed an application for disability benefits with the Board. He sought a 65% pension by reason of having suffered a stroke in the line of duty (40 ILCS 5/3-114.3 (West 2008)) or a 65% pension for a line-of-duty disability (40 ILCS 5/3-114.1 (West 2008)) and, as an alternative to both, a 50% nonduty disability pension (40 ILCS 5/3-114.2 (West 2008)).

¶ 17    The plaintiff continued to receive medical care for intermittent paresthesias and numbness of the right hand, incoordination, decreased sensation, and depression from the time of the

filing of his application for disability benefits through the Board hearings which were held in February and July of 2011.

¶ 18    Acting pursuant to section 3-115 of the Code (40 ILCS 5/3-115 (West 2008)), the Board requested that three physicians, Drs. Elizabeth S. Kessler, Alexander Obolsky and Richard Munson, evaluate the plaintiff and render opinions as to, *inter alia*, the nature and extent of the plaintiff's disability, its likely duration, and whether the plaintiff's disability is the direct result of the events of July 31, 2009.

¶ 19    On March 1, 2011, Dr. Schneck noted that the plaintiff had some of the classical risk factors for stroke, including hypertension, obesity, and hyperlipidemia, but he found no clear link between those risk factors and a stroke in a person of the plaintiff's relatively young age. Dr. Schneck wrote that the plaintiff had reported a high incidence of work stress just prior to his last stroke and, although work stress can be a trigger for hemorrhage stroke, its impact on an ischemic stroke is not well defined. It is, however, well documented that chronic work stress is a significant and independent risk factor for both coronary and cerebral vascular disease. Dr. Schneck stated his belief that there is some association between the plaintiff's occupation and his subsequent cerebral ischemic stroke, although he could not quantify the absolute strength of that association. The Board held hearings on the plaintiff's application for disability benefits on February 23 and July 12, 2011. During the course of those hearings, the Board heard the testimony of the plaintiff, his wife, Sergeant Hundley, and Deputy Chief Pulec. In addition, various exhibits were received into evidence, including the plaintiff's medical records and the reports of Drs. Kessler, Obolsky, and Munson. The reports of the three physicians were received in evidence without objection.

¶ 20    In her report dated May 9, 2010, Dr. Kessler noted that she had examined the plaintiff on May 6, 2010, and had reviewed his medical records, including the records of his treatment on July 31, 2009, and September 30, 2009. Based on her examination of the plaintiff and her review of his medical record, Dr. Kessler concluded that, given the plaintiff's "persistent symptoms following the stroke, with a continued feeling of right leg weakness, intermittent right upper extremity paresthesias, mood changes and a report of pin and vibratory sensations over the right upper and lower extremities on examination, *** [the plaintiff] is not able to return to work as a police officer." She also stated that "there is no way to determine if or when he may have improvement." In addition to her report, Dr. Kessler also signed a physician's certificate, which was introduced in evidence, stating that, based upon her report, she certified that the plaintiff is disabled for service in the Department.

¶ 21    Dr. Obolsky executed a physician's certificate, certifying that the plaintiff is disabled for full duty, but able for light duty, in the Department. In his report dated November 12, 2010, Dr. Obolsky related the history given to him by the plaintiff, the results of his examinations of the plaintiff, and the extent of his review of the plaintiff's medical records. In that report, Dr. Obolsky opined that the plaintiff suffers from: "DMS-IV TR Axis I Code 294.9 Cognitive Disorder Not Otherwise Specified (NOS)[;] DMS-IV TR Axis I Code 309.28 Adjustment Disorder with Mixed Anxiety and Depressed Mood[; and] DMS-IV TR Axis III Stroke, Transient Ischemic Attack." On the question of whether the plaintiff's disabilities were work related as alleged by the plaintiff, Dr. Obolsky wrote that he "does not have the requisite expertise to offer an opinion as to the accuracy of such an alleged connection." He did, however, opine that the plaintiff's cognitive defects are causally related to the stroke and

transient ischemic event and that his adjustment disorder is a response to his cognitive difficulties.

¶ 22 On January 6, 2011, Dr. Munson issued his report in which he found that the plaintiff's alleged disability is a direct result of the July 31, 2009, incident, noting that although the plaintiff might have been predisposed for depression and anxiety prior to the stroke, "these symptoms can certainly be the result of his stroke." Dr. Munson also wrote:

"There is no evidence, in my opinion, that the stroke was the result of his on-duty activities. I do not think that the stroke was the result of aggravating a pre-existing condition, nor was it clearly solely caused by a pre-existing condition. His stroke did not have clear etiology."

¶ 23 Dr. Munson also executed a physician's certificate, certifying that the plaintiff is disabled for service in the Department.

¶ 24 On November 15, 2011, following the hearings on the plaintiff's application for disability benefits, the Board issued a unanimous written decision, finding that, although the plaintiff is disabled, he failed to meet his burden of proving that his disability is the result of a stroke suffered as a result of the performance of his duties as a police officer or resulting from the performance of an act of duty as a police officer. Consequently, the Board denied the plaintiff's application for a 65% pension under either section 3-114.1 or section 3-114.3 of the Code, and instead, awarded him a 50% non-duty disability pension under section 3-114.2 of the Code.

¶ 25 The plaintiff timely filed a complaint for administrative review of the Board's decision in the circuit court of Cook County. The circuit court confirmed the Board's decision, and this appeal followed.

¶ 26 In urging reversal of both the circuit court's judgment and the Board's decision, the plaintiff argues that the Board erred in denying him a 65% pension under either section 3-114.1 or section 3-114.3 or the Code and also erred when it requested that the three physicians selected to examine him render opinions as to whether his disability was the result of his performance of an act of duty as a police officer. The plaintiff requests that we reverse the Board's denial of his application for a 65% disability pension or, in the alternative, we vacate the Board's decision and remand the matter to the Board with instructions to "commence a new medical review."

¶ 27 As this matter comes to us as an appeal from a judgment of the circuit court rendered in an administrative review action, we review the decision of the Board, not the determination of the circuit court. *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 504 (2007). In so doing, we are obligated by statute to take all of the findings and conclusions of the Board to be *prima facie* true and correct. 735 ILCS 5/3-110 (West 2010). Our standard of review depends upon the nature of the question we are addressing. As to questions of law, our review is *de novo*. *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). Questions of fact are reviewed using a manifest weight standard. *Id.* Mixed questions of fact and law are reviewed under a clearly erroneous standard. *Id.*

¶ 28 Under section 3-114.1 of the Code, a police officer employed by a municipality of 500,000 inhabitants, or under, such as the plaintiff, is entitled to a pension equal to 65% of his salary if, "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty, is found to be physically or mentally disabled for service in the police department, so as to render necessary his or her suspension or retirement from the police service." 40 ILCS

5/3-114.1 (West 2008). Under section 3-114.3 of the Code, a police officer such as the plaintiff is entitled to a pension equal to 65% of his salary if he suffers a "stroke as a result of the performance and discharge of police duty" and is found to be physically or mentally disabled for service in the police department. 40 ILCS 5/3-114.3 (West 2008). Under either section of the Code, no disability pension may be paid "unless there is filed with the board certificates of the police officer's disability, subscribed and sworn to by the police officer if not under legal disability, or by a representative if the officer is under legal disability, and by the police surgeon (if there be one) and 3 practicing physicians selected by the board." 40 ILCS 5/3-115 (West 2008).

¶ 29    In this case there is no dispute concerning the fact that the plaintiff is disabled as the Board so found. The question is whether the Board's finding that he failed to meet his burden of proving that his disability is the result a stroke suffered as a result of the performance of his duties as a police officer or resulting from the performance of an act of duty as a police officer.

¶ 30    The plaintiff in an administrative hearing has the burden of proof and relief will be denied if he fails to sustain that burden. *Wade*, 226 Ill. 2d at 505. The question of whether the evidence of record supports the Board's denial of the plaintiff's application for a 65% disability pension is one of fact, and the Board's determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Kouzoukas v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 234 Ill. 2d 446, 464 (2009); *Wade*, 226 Ill. 2d at 505. The decision of an administrative agency, such as the Board, is against the manifest weight of the evidence if an opposite conclusion is clearly evident. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992). The test is not whether we might have reached the same result; the appropriate test is whether there is sufficient evidence in the record to support the Board's determination. *Id.*

¶ 31    In this case, we believe there is sufficient evidence in the record to support the Board's finding that the plaintiff failed to prove that his disability is the result of a stroke suffered as a result of the performance of his duties as a police officer or resulting from the performance of an act of duty as a police officer. As early as October 15, 2009, Dr. Alberts noted that the mechanism of the plaintiff's stroke "is of unclear etiology." Dr. Munson also found that the plaintiff's stroke did not have a clear etiology and went on to state that there is "no evidence" that his stroke was the result of on-duty activities. Admittedly, Dr. Schneck opined that there is some association between the plaintiff's occupation and his subsequent cerebral ischemic stroke. Nevertheless, it was the Board's function to resolve the conflict in medical evidence. *O'Dette v. Industrial Comm'n*, 79 Ill. 2d 249, 253 (1980); *City of Springfield v. Illinois Workers' Compensation Comm'n*, 388 Ill. App. 3d 297, 315 (2009). In this case the Board found Dr. Munson's opinion credible and relied upon it to support its finding on causation, and we are unable to find, based upon the record before us, that an opposite conclusion is clearly apparent. *City of Springfield*, 388 Ill. App. 3d at 315.

¶ 32    The plaintiff also argues that the Board erred when it requested causation opinions from Drs. Kessler, Obolsky, and Munson. According to the plaintiff, the statute (40 ILCS 5/3-115 (West 2008)) only required that the Board's selected physicians render opinions on the question of whether he is disabled, not on the question of causation. For this reason, he contends that the Board erred in relying on Dr. Munson's causation opinion, which is contained in his written report, and requests that we order a new medical review. However, having failed to object to the introduction of Dr. Munson's report during the hearing on his

disability application, the plaintiff has forfeited any objection to the Board's consideration of the causation opinion, contained in that report. *Caradco Window & Door v. Industrial Comm'n*, 86 Ill. 2d 92, 97 (1981); *Docksteiner v. Industrial Comm'n*, 346 Ill. App. 3d 851, 855 (2004).

¶ 33    Having found sufficient factual evidence in the record supporting the Board's determination that the plaintiff failed to prove that his disability is the result of a stroke suffered as a result of the performance of his duties as a police officer or resulting from the performance of an act of duty as a police officer, we are unable to conclude that the Board's decision denying him a 65% pension under either section 3-114.1 or section 3-114.3 of the Code is against the manifest weight of the evidence. Based upon our determination in this regard, we affirm the judgment of the circuit court which confirmed the Board's decision in this case.

¶ 34    Affirmed.