2019 IL App (1st) 190643WC-U

Workers' Compensation
Commission Division
Order Filed: December 27, 2019

No. 1-19-0643WC

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| JOANNE SIMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellant, | ) | Cook County |
| | ) | |
| v. | ) | No. 18 L 50043 |
| | ) | |
| | ) | |
| THE ILLINOIS WORKERS' COMPENSATION | ) | |
| COMMISSION *et al.*, | ) | Honorable |
| | ) | Michael F. Otto, |
| (University of Illinois at Chicago, Appellee). | ) | Judge, Presiding. |

JUSTICE HOFFMAN delivered the judgment of the court.
Presiding Justice Holdridge and Justices Hudson, Cavanagh, and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held:*   We affirmed the circuit court's judgment confirming the Workers' Compensation Commission's decision finding that the claimant's current condition of shoulder and spine ill-being are not causally related to her work injury and denying her request for an award of attorney fees and penalties.

¶ 2    The claimant, Joanne Sims, appeals from an order of the circuit court of Cook County that confirmed a decision of the Workers' Compensation Commission (Commission) which, *inter alia,*

found that her current condition of shoulder and spine ill-being are not causally related to her work injury of January 4, 2011, and denied her request for an award of attorney fees and penalties pursuant to sections 16, 19(k), and 19(*l*) of the Workers' Compensation Act (Act) (820 ILCS 305/16, 19(k), 19(l) (West 2014)). For the reasons that follow, we affirm the judgment of the circuit court.

¶ 3     The following factual recitation is taken from the evidence adduced at the arbitration hearing held on December 9, 2015.

¶ 4     The claimant testified to the following set of facts. On January 4, 2011, she was employed by the University as a fiscal administrator in the College of Urban Planning and Public Affairs. On that date, she caught an intruder in her office going through her purse. She told the intruder to stop and the intruder "charged towards" her, pushing her into the door frame of her office. Her left arm and hand struck the corner of the door frame and she felt "excruciating pain" in her fingers. When her left arm struck the door frame, the claimant's left hand was above her head and her arm was bent at the elbow, similar to the hand signal for a right turn. With her right hand, the claimant grabbed the intruder's hooded sweatshirt, as a co-worker fought with the intruder. In the ensuing altercation, all three of them fell to the ground. The altercation proceeded down the hallway, with the trio falling to the ground at least two more times along the way. Eventually, the intruder escaped. In total, the ordeal lasted "well over five minutes."

¶ 5     According to medical records, the claimant visited the University of Illinois Medical Center at Chicago emergency room that same day and was released with instructions to keep her fingers in a splint. The claimant was diagnosed with a small closed nondisplaced intraarticular fracture of

the left ring finger and a soft tissue injury to the middle finger. The claimant reported "no other injuries sustained."

¶ 6 Also on January 4, 2011, the claimant filled out a "First Report of Injury" form. The claimant listed her only injuries as a fracture to her left ring finger and an injury to her left middle finger. The claimant also filled out an "Employee's Injury Report" where she listed only that she fractured her left ring finger.

¶ 7 On January 5, 2011, the claimant visited the University of Illinois Health Services. The records of that visit establish that she reported only injuries to her two left fingers and that her diagnosis was the same. She was permitted to return to work with "limited use of the left hand." A follow-up visit was scheduled for January 24, 2011.

¶ 8 On January 11, 2011, the claimant visited Dr. Michael Bednar, an orthopedic surgeon at the Loyola University Medical Center. Records of that visit reflect that Dr. Bednar conducted a physical examination of the claimant, revealing "full range of motion of the elbow, forearm, wrist, and fingers with exception to the left ring finger." An x-ray of the claimant's left hand revealed a fracture at the distal end of the middle phalanx into the region of the DIP joint of the left ring finger.

¶ 9 On January 24, 2011, the claimant returned to the University of Illinois Health Services for her follow-up visit. During the visit, she reported Dr. Bednar's finding that she had a second fracture. The claimant was ordered to remain on "modified duty" and not to use her left hand for 4-6 weeks.

¶ 10 On February 22, 2011, the claimant again treated with Dr. Bednar. Notes from that visit indicate that the claimant reported "multiple complaints." She reported to Dr. Bednar that the splint

"helped to decrease the numbness of her hand." She also reported that using her left hand caused "more pain and numbness radiating from the wrist to the elbow." Dr. Bednar conducted a physical examination and noted "no regions of point tenderness." He provided a note to the claimant stating that she could return to work without restrictions.

¶ 11    On March 14, 2011, the claimant, based on her attorney's recommendation, visited Dr. Scott Rubinstein. Notes from that visit indicate that the claimant's "main complaints" were of a "stocking-glove type of distribution of numbness throughout her arm from about mid-upper arm just above the elbow all the way down to the fingers." Dr. Rubinstein conducted a physical examination of the claimant and noted that she had full range of motion in her left arm. The claimant did not report any pain or discomfort with any motion of the neck. Dr. Rubinstein stated that his impression was that the claimant "may have some neurologic things going on, possibly a stretch of the brachial plexus or one of the cervical nerve roots" and he ordered an EMG.

¶ 12    The claimant treated with Dr. Rubinstein again on April 27, 2011. Dr. Rubinstein's notes indicate that the claimant's EMG "did not show much of anything." Dr. Rubinstein further noted that the claimant "still has this vague numbness in her upper extremity that appears to be coming from [a] more central location." He performed a physical examination of the claimant, revealing that her shoulder had a full range of motion. He noted that "holding her arm abducted and extended does not cause [the claimant] to have any increased symptoms, such as would be seen with a stretch of the brachial plexus." Dr. Rubinstein still believed that the claimant's issue was "neurologic."

¶ 13    On May 18, 2011, the claimant returned to Dr. Rubinstein. According to his notes of the visit, the claimant reported that she was still experiencing "some numbness going down the arm." Dr. Rubinstein noted that the claimant "did wrench her neck at the time of the initial injury" and

ordered an MRI of the claimant's cervical spine. The MRI showed that the claimant had "some multilevel disc disease from the C3-4 level down through the C6-7 level between some posterior disc bulging and some pre-existing osteophytes and joint hypertrophy there is some degree of central and foraminal stenosis." Dr. Rubinstein recommended a Medrol Dosepak and physical therapy.

¶ 14    On June 3, 2011, the claimant visited her primary care physician, Dr. Maureen Fearon. According to Dr. Fearon's notes, the claimant reported that her left arm pain and weakness began a month after her work injury.

¶ 15    On October 3, 2011, the claimant again treated with Dr. Rubinstein, who noted that she reported temporary relief from the Medrol Dosepak. He also noted that the claimant did not respond to the physical therapy. He recommended "a more aggressive treatment in the form of an epidural steroid injection" in her cervical spine. Dr. Rubinstein also ordered an MRI of the claimant's left shoulder. The MRI took place on November 23, 2011. The MRI report detailed that there was no evidence of a fracture or AC separation and no tear of the rotator cuff. The report did note evidence of tendinitis.

¶ 16    On December 6, 2011, at the University's request, the claimant underwent an independent medical evaluation (IME) by Dr. Gunnar B. Andersson. Dr. Andersson wrote in his report that the claimant was "slammed" into her door and developed contusions to two of her fingers on the left hand. He noted that her fingers had healed but "there was a remaining stocking, glove-like numbness in the left hand and some symptoms from the left elbow." Dr. Andersson documented the claimant's current complaints as "pain in her left shoulder area radiating out into the arm and

down the left upper extremity." He noted that she did not have neck pain but "occasionally some radiation in that direction."

¶ 17    Dr. Andersson conducted a physical examination and documented that the claimant had "some tenderness" over the left scapular and collar bone region. His report further stated that the range of motion of the claimant's cervical spine was "mildly decreased mainly in left lateral and left rotation" and that her Spurling's tests were negative bilaterally. Dr. Andersson reviewed the May 24, 2011 MRI of the claimant's cervical spine and her EMG results. He confirmed that her EMG results were normal and that the MRI of her cervical spine revealed the following: "degenerative changes at C2-3, 3-4, 4-5, and 5-6. At 4-5 and 5-6 there are fairly large bulging discs causing mild to moderate stenosis mainly on the left side at C5-6 slight toward the right and C6-7."

¶ 18    Dr. Andersson opined that it was "unlikely" that the claimant had an injury to her neck because her EMG was "completely normal." He acknowledged that the claimant had degenerative changes that were "fairly significant" in the mid-cervical spine, but he opined that it was "hard to understand how those could have been aggravated and not cause neck pain or radicular symptoms or a positive EMG." Dr. Andersson noted that the claimant had an MRI of her left shoulder that showed tendonitis. He stated that, although he was not a shoulder expert, the claimant's symptoms "appear more related to the shoulder than they do to the neck." He stated that it "does seem that the [claimant's] symptoms began at the time of the accident and that treatment has been reasonable to this." He concluded that the claimant's symptoms were not "a neck related problem" and that the claimant "has not reached maximum medical improvement with respect to the accident."

¶ 19    On March 21, 2012, the claimant once again saw Dr. Rubinstein. In his notes from that visit, Dr. Rubinstein wrote that he agreed with Dr. Andersson that the claimant's shoulder "was part of the problem." Dr. Rubinstein opined that the claimant's symptoms were consistent with "a little bit of cervical nerve root irritation and possibly some rotator cuff tendinitis in her shoulder." He noted that the claimant refused the epidural steroid injection, did not want to proceed with "more aggressive treatment," and did not want to continue with physical therapy.

¶ 20    Dr. Allan Brecher, a board certified orthopedic surgeon, conducted a review of the claimant's medical records on the University's behalf. In his November 7, 2014 report, Dr. Brecher found "no clear temporal connection" between the claimant's work-related injury and her neck and shoulder problems. He stated that the claimant had "pre-existing degenerative changes of the neck and we do not have notes from the time of injury suggesting a neck or shoulder problems [*sic*]." He concluded that, based on Official Disability Guidelines (ODG), "there is no clear causation between the neck and left shoulder complaints" and the claimant's work-related injury.

¶ 21    The claimant further testified that, as of the date of the arbitration hearing, she continued to experience pain and numbness in her left hand and arm up to the base of her neck, and as a result, she limits her activities. She has difficulty driving and turning her head to the left. The claimant maintained that she never experienced any symptoms prior to the work-related accident. The claimant continued to work her regular job until she retired. According to the claimant, her physicians have told her that there are no more treatment options for her, but she would seek more treatment if it would help her get better.

¶ 22    Following the arbitration hearing on December 9, 2015, the arbitrator held the following: (1) the University employed the claimant on January 4, 2011; (2) she suffered an accident on that

date that arose out of and in the course of her employment; and (3) the claimant's current condition of ill-being in regards to both her left middle and ring finger were causally related to the accident. The arbitrator also found, however, that the claimant's current condition of ill-being related to her left shoulder and cervical spine are not causally related to her work accident. In so holding, the arbitrator placed "great weight on the lack of shoulder and neck complaints in the initial records" and credited the opinions of Drs. Andersson and Dr. Brecher as "persuasive on this issue." The arbitrator ordered the University to pay the claimant's out-of-pocket medical expenses totaling $188.48 and awarded the claimant permanent partial disability (PPD) benefits pursuant to section 8(e) of the Act, representing 10% loss of use of the left ring finger. The arbitrator denied the claimant's claim for penalties and attorney's fees pursuant to sections 16, 19(k), and 19(*l*) of the Act.

¶ 23    The claimant filed a petition for review of the arbitrator's decision before the Illinois Workers' Compensation Commission (Commission). On January 8, 2018, the Commission affirmed and adopted the arbitrator's decision.

¶ 24    The claimant sought a judicial review of the Commission's decision in the circuit court of Cook County. In its response, the University argued that the Commission's decision should be affirmed in all respects, except for the award of out-of-pocket medical expenses. On October 24, 2018, the circuit court entered a written order confirming the Commission's decision. In so holding, the circuit court found that there was "medical testimony on both sides" regarding whether the claimant's current condition of ill-being with regard to her neck and left shoulder was causally related to her work-related injury. In discussing Dr. Belcher's findings, the circuit court referred

to him as a "shoulder expert." The circuit court order did not address the Commission's award of out-of-pocket medical expenses.

¶ 25    The University filed a motion, arguing that the circuit court erroneously failed to rule on its argument regarding whether the Commission's award of $188.48 in out-of-pocket medical expenses was against the manifest weight of the evidence. On November 9, 2018, the circuit court entered an order, finding that the University had, in fact, raised the out-of-pocket medical expense issue in its response brief. Addressing the merits of the issue, the circuit court confirmed the Commission's award of $188.48 in out-of-pocket medical expenses.

¶ 26    The claimant filed a motion to reconsider and for sanctions, arguing that the University falsely described Dr. Brecher as a "shoulder specialist" in its brief before the circuit court when he was merely board certified in orthopedic surgery. The University conceded that its description of Dr. Brecher was incorrect but argued that its error was inadvertent and would not change the outcome. The circuit court denied the claimant's motions and modified its order to replace the phrase "shoulder expert" with "orthopedic surgeon." The claimant now appeals.

¶ 27    As an initial matter, we observe that the claimant directs each of her assignments of error against the order of the circuit court affirming the Commission's decision. When, as here, an appeal is taken following entry of judgment by the circuit court on review from a decision of the Commission, this court reviews the ruling of the Commission, not the judgment of the circuit court. *Dodaro v. Illinois Workers' Compensation Comm'n*, 403 Ill. App. 3d 538, 543 (2010).

¶ 28    On appeal, the claimant raises the following two arguments: the Commission denied her due process by relying on Dr. Brecher's opinion because he based his conclusion on the ODG standard, which has not been recognized by Illinois; and the Commission erred in denying the

claimant's petition for penalties and attorney fees pursuant to sections 16, 19(k), and 19(*l*) of the Act.

¶ 29    Before addressing the claimant's first assignment of error, we must address the University's contentions that the claimant's brief failed to comply with Supreme Court Rule 341 (eff. July 1, 2017) and that she waived her first argument on appeal by failing to raise the issue below.

¶ 30    Rule 341(h)(6) provides, in pertinent part, that an appellant's statement of facts "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal[.]" Ill. S. Ct. R. 341(h)(6) (eff. Jan. 1, 2016). The claimant's brief is devoid of proper citations to the record. It contains only one citation to an exhibit filed during the arbitration hearing but no citations to any pages in the common law record. As a result, we were required to sift through the record in an effort to find the claimant's underlying factual support.

¶ 31    Moreover, the claimant also failed to cite any authority for several portions of her argument section. Rule 341(h)(7) provides that an appellant's opening brief must "contain the contentions and reasons therefor, with citation to the authorities" upon which the appellant relies. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). As a reviewing court, we are entitled to have the issues clearly defined, pertinent authority cited, and a cohesive legal argument presented. *Walters v. Rodriguez*, 2011 IL App (1st) 103488, ¶ 5. The appellate court is not a depository in which the appellant may foist the burden of argument and research. *Lewis v. Heartland Food Corp.*, 2014 IL App (1st) 123303, ¶ 5.

¶ 32    The purpose of the rules governing the contents of briefs is to require the parties before the appellate court to present orderly and clear arguments so that this court can properly identify and dispose of the issues raised. *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 7. All of the rules governing the content of appellate briefs are requirements, not mere suggestions. *Id.* Where an appellant's brief contains numerous Rule 341 violations and, in particular, impedes our review of the case at hand because of them, it is our right to strike that brief and dismiss the appeal. *Rosestone Investments, LLC v. Garner*, 2013 IL App (1st) 123422, ¶ 18. We will not invoke either of these remedies in this case because our review has not been hindered as the case is simple, and the record is not voluminous. However, we have disregarded any improper factual statements or arguments that find no support in the record. Moreover, we admonish the claimant's attorney to follow the requirements of the supreme court rules in future submissions.

¶ 33    The University also argues the claimant forfeited her first argument, that the Commission denied her due process, by failing to raise the issue before the Commission. The University is correct that the claimant did not raise this issue before either the Commission or the circuit court and it is, therefore, waived. See, e.g., *R.D. Masonry, Inc. v. Industrial Comm'n*, 215 Ill. 2d 397, 414 (2005) ("Arguments not raised before the Commission are waived on appeal."); see also *U.S. Steel Corporation–South Works v. Industrial Comm'n*, 147 Ill. App. 3d 402, 406 (1986) (ruling that an issue raised for the first time in the circuit court "may be considered waived because the circuit court *** has no authority to consider evidence or arguments not presented before the Commission").

¶ 34    The claimant maintains that she has not forfeited this issue, arguing that she objected to Dr. Brecher's report for lack of notice during the arbitration proceeding. According to the claimant,

the arbitrator refused to "bar" Dr. Brecher's report but offered to continue the proceeding so that she could depose him. The claimant contends that the arbitrator then suggested that, alternatively, she could waive her objection and "trust" the arbitrator to "give [Dr. Brecher's] report the weight that it deserves, being a records review that was held for a year and tendered on the morning of trial." The claimant provides no record cite for her alleged objection or this purported exchange with the arbitrator, nor could we find it in our review of the record. Rather, the transcript establishes that the claimant's counsel stated that he had "no objection" to Dr. Brecher's report. That said, even if this exchange took place, the claimant still provides no explanation for why she did not raise the issue before the Commission, which is the decision that we review on appeal. *Dodaro*, 403 Ill. App. 3d at 543. Consequently, we find that she has forfeited her first assignment of error. *R.D. Masonry*, 215 Ill. 2d at 414.

¶ 35     Forfeiture aside, we find no merit to the claimant's argument that the Commission denied her due process. The claimant contends that the ODG standard that formed the basis of Dr. Bercher's opinion has not been accepted in Illinois and that it was a violation of her due process rights for the Commission to consider Dr. Bercher's opinion without her consent. As mentioned, the claimant did not cite to any authority in support of her argument, nor could we find any such support in our own research to support her claim. Moreover, we find no evidence in the record to support the claimant's argument that the Commission considered Dr. Brecher's report without her "consent." The record indicates that the claimant's counsel affirmatively stated that he had "no objection" to Dr. Brecher's report and that the claimant did not raise the issue of the report's admissibility before the Commission. Accordingly, the Commission did not deny the claimant due process.

¶ 36    To the extent that the claimant's argument can be construed as a challenge to the Commission's determination that her left shoulder and spine injuries are not causally related to her work accident, we disagree with the claimant.

¶ 37    Whether a causal relationship exists between a claimant's employment and his condition of ill-being is a question of fact to be resolved by the Commission. *Certi-Serve, Inc. v. Industrial Comm'n*, 101 Ill. 2d 236, 244 (1984). In resolving such issues, it is the function of the Commission to decide questions of fact, judge the credibility of witnesses, determine the weight to be accorded to their testimony, and resolve conflicting medical evidence. *Hosteny v. Illinois Workers' Compensation Comm'n*, 397 Ill. App. 3d 665, 674 (2009). The Commission's determination on a question of fact will not be disturbed on review unless it is against the manifest weight of the evidence. *Docksteiner v. Industrial Comm'n*, 346 Ill. App. 3d 851, 856-757 (2004). For a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. *Westin Hotel v. Industrial Comm'n*, 372 Ill. App. 3d 527, 539 (2007).

¶ 38    Here, the records from the claimant's emergency room visit, her injury report forms, and the records from her visits with Dr. Bednar all establish that she did not report an injury to her left shoulder or cervical spine until over a month after her January 4, 2011 work accident. Moreover, Drs. Andersson and Brecher opined that the claimant's injuries to her cervical spine and left shoulder are not causally related to her January 4, 2011 work accident. Although Dr. Rubinstein's records indicate that he reached the opposite conclusion, the Commission resolved this conflict against the claimant, as was its province to do. See *Hosteny*, 397 Ill. App. 3d at 674. Given this record, and in light of the Commission's role in weighing the evidence, we cannot say that the

opposite conclusion was clearly apparent. As such, we conclude that the Commission's decision is not against the manifest weight of the evidence.

¶ 39    The claimant finally argues that the Commission's decision to deny her penalties under sections 19(k) and (*l*) of the Act (820 ILCS 305/19(k), (*l*) (West 2014)) and attorney fees under section 16 of the Act (820 ILCS 305/16 (West 2014)) was against the manifest weight of the evidence.

¶ 40    Penalties under section 19(*l*) are, essentially, a late fee, and the assessment of a penalty is mandatory if a payment is late and the employer cannot show an adequate justification for the delay. *Mechanical Devices v. Industrial Comm'n*, 344 Ill. App. 3d 752, 763 (2003). "In determining whether an employer has 'good and just cause' in failing to pay or delaying payment of benefits, the standard is reasonableness." *Id.* (citing *McMahan v. Industrial Comm'n*, 183 Ill. 2d 499, 515 (1998)). The employer has the burden for justifying the delay. *Jacobo v. Illinois Workers' Compensation Comm'n*, 2011 IL App (3d) 100807WC, ¶ 19. "The Commission's evaluation of the reasonableness of the employer's delay is a question of fact that will not be disturbed unless it is contrary to the manifest weight of the evidence." *Id.*

¶ 41    By contrast, awards under sections 16 and 19(k) are proper only if the employer's delay in making payment is unreasonable or vexatious. *McMahan*, 183 Ill. 2d at 504-05. That is, the refusal to pay must result from bad faith or improper purpose. *Id.* at 515. Thus, the "imposition of section 19(k) penalties and section 16 attorney fees requires a higher standard than an award of additional compensation under section 19(*l*)." *Id.* at 514.

¶ 42    Here, the Commission found that the University's decision to withhold payment for medical expenses related to the claimant's left shoulder and cervical spine was not "unreasonable

or vexatious." The claimant argues that the Commission erred in this determination because both her treating orthopedic surgeon, Dr. Rubinstein, and Dr. Andersson, who conducted an IME for the University, determined that those treatments were reasonable and necessary. The University responds that it was justified in delaying payment because it disputed whether the claimant's left shoulder and cervical spine injuries were causally related to her work-place incident, not whether treatment for these injuries were unreasonable.

¶ 43    We conclude that the record supports the Commission's denial of penalties under section 19(*l*) of the Act. The Commission found that the claimant failed to prove that her current condition of ill-being related to her left shoulder and cervical spine were causally related to her work accident because the evidence showed that she did not report any such injuries for over a month after the accident. Moreover, the Commission found that the opinions of Drs. Andersson and Becher, who both opined that her injuries were not causally related to her accident, supported its conclusion. We cannot say that the Commission's determination is unreasonable; and therefore, the University had good cause to deny payment for the claimant's medical expenses. See *Avon Products, Inc. v. Industrial Comm'n*, 82 Ill. 2d 297, 304 (1980). Accordingly, the Commission's denial of section 19(*l*) penalties was not against the manifest weight of the evidence.

¶ 44    Having determined that the Commission did not err in denying the claimant's request for section 19(*l*) penalties, we also conclude that the Commission did not err in denying penalties pursuant to sections 16 and 19(k) of the Act because, as mentioned, such penalties require a higher standard of proof than an award of additional compensation under section 19(*l*). See *USF Holland, Inc. v. Industrial Comm'n*, 357 Ill. App. 3d 798, 806 (2005).

¶ 45     For these reasons, we affirm the judgment of the circuit court that confirmed the decision

of the Commission.

¶ 46     Affirmed.