No. 2—10—0063
Opinion filed March 8, 2011

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| EDWARD LINDEMULDER, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 08—MR—1981 |
| | ) | |
| THE BOARD OF TRUSTEES OF THE | ) | |
| NAPERVILLE FIREFIGHTERS' PENSION | ) | |
| FUND and THE CITY OF NAPERVILLE, | ) | Honorable |
| | ) | Bonnie M. Wheaton, |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Burke and Schostok concurred in the judgment and opinion.

**OPINION**

Plaintiff, Edward Lindemulder, appeals from an order of the circuit court of Du Page County affirming the decision of defendant the Board of Trustees of the Naperville Firefighters' Pension Fund (Board) denying his application for a line-of-duty pension and an occupational disease pension. For the reasons that follow, we affirm.

BACKGROUND

Plaintiff became a firefighter/paramedic with defendant the City of Naperville (City) on January 4, 1988. On December 15, 2006, when plaintiff was 50 years old, the City placed him on a medical leave due to a serious health condition that made him unable to perform the essential functions of his job. In January 2007, a physician certified that plaintiff suffered from a permanent

and irreversible condition called chronic obstructive pulmonary disease (COPD), which rendered plaintiff unable to tolerate the physical demands of his job. On January 15, 2007, plaintiff filed an application for disability benefits with the Naperville Firefighters' Pension Fund, seeking line-of-duty benefits under section 4—110 of the Illinois Pension Code (Code) (40 ILCS 5/4—110 (West 2006)) or, in the alternative, occupational disease benefits under section 4—110.1 of the Code (40 ILCS 5/4—110.1 (West 2006)). The City was granted leave to intervene. The Board held hearings on plaintiff's application over five days and received numerous exhibits into evidence.

The parties agreed that plaintiff's disability is permanent. Throughout the proceedings before the Board, plaintiff admitted that his COPD was caused by cigarette smoking. However, plaintiff contended that exposure to diesel fumes in the fire station and to fire smoke contributed to or exacerbated his COPD. The evidence before the Board revealed the following facts.

Growing up, plaintiff was exposed to second-hand cigarette smoke, and he began smoking cigarettes at age 16 or 17. During his active employment with the City, plaintiff smoked approximately a pack to a pack and a half of cigarettes per day. He was known to break off the filters in order to achieve better draws. As a firefighter/paramedic, plaintiff was called to a fire monthly or bimonthly. During fire suppression, plaintiff wore a self-contained breathing apparatus (SCBA). He was trained in its use and would wear it until instructed by a safety officer that he could remove it to begin salvage and overhaul operations at a fire scene. According to plaintiff, there were smoke and fumes present during salvage and overhaul operations.

Plaintiff underwent yearly fitness-for-duty medical examinations. In 1996, the examining physician noted that plaintiff's pulmonary functions were slightly decreased from past exams. Plaintiff began unintentionally to lose weight, and by 2000 he experienced shortness of breath when walking

fast on level ground or up a slight incline, and he had a cough that produced phlegm. In 2002, his tests revealed possible early obstructive pulmonary impairment. In 2005, the examining physician reported that plaintiff suffered from "obstructive lung disease most likely secondary to his excessive smoking." All of plaintiff's attempts to stop smoking were unsuccessful.

On October 25, 2006, plaintiff collapsed to the floor during training in the SCBA trailer. His supervisor found him on the floor with labored breathing and his regulator off. Plaintiff stated that he could not catch his breath and could not get enough air. On November 21, 2006, plaintiff's superiors took him off duty, and after medical tests showed that his COPD was advanced to the stage where he could no longer perform firefighting functions, plaintiff never returned to duty. On January 11, 2007, an examining physician found that plaintiff had significant "dyspnea with exertion [shortness of breath with effort] and cannot tolerate the physical demands of his job due to his COPD."

From 1998 to 2006, plaintiff was assigned to fire station No. 3, where he lived and slept during his 24-hour shifts. According to plaintiff, there was no negative pressure room for storing turnout gear (coats and pants worn by firefighters at fire suppression). Two diesel vehicles were assigned to station No. 3: Engine 3 and Medic 3. As of 2000 or 2001, station No. 3 was equipped with a Nederman system, which is a set of exhaust hoses that attach to diesel engine tail pipes. Firefighters hook up the hoses to the vehicles when they pull into the station, and the system exhausts the diesel fumes out of the station. Plaintiff testified that because of the configuration of station No. 3 the firefighters hooked up the hoses to the vehicles only after the vehicles had already been parked inside the station. The apparatus floor where the vehicles were parked was separate from the sleeping quarters. The two areas were separated by self-closing doors.

In station No. 3, plaintiff observed heavy black dust, which he believed came from the diesel exhaust. He testified that he would wake up with an irritated throat, a cough, sometimes a runny nose, and sometimes irritated eyes. According to plaintiff, other firefighters experienced similar symptoms. Plaintiff did not request a transfer out of station No. 3.

Captain Rick Sander worked at station No. 3 and was plaintiff's officer. Sander testified that he, along with other firefighters, developed upper respiratory symptoms while working at station No. 3. Sander did not obtain treatment or a diagnosis. According to Sander, mold studies done at the station were negative, although he recalled seeing black mold after remodeling was done.

Firefighter/Paramedic Jody Jones, a nonsmoker, began experiencing a cough, sinus infections, and colds after she was assigned to work in station No. 3. She was diagnosed with reactive airway disease, which could have been caused by diesel fumes, mold, or other environmental substances.

Firefighter/Paramedic John Adair testified regarding air purifying machines installed at the Naperville fire stations, particularly at station No. 3, where people seemed to be getting a lot of colds. The machines were purchased to help alleviate dust, allergy, and mold problems. Every 28 days Adair cleaned the filters in the machines at station No. 3 as well as at other stations. He testified that the filters at station No. 3 were disgustingly dirty compared to those at other stations. When he recommended to the City that the air quality at station No. 3 be tested, nothing came of his request.

James Inglese was the fleet services manager for the City who was involved in procuring, servicing, maintaining, and repairing the City's fire apparatus and equipment. He was in the automotive industry for 30 years and had a bachelor of science degree in automotive heavy equipment technology. Inglese testified that diesel engines take a number of minutes before they come up to operating temperature, during which time they emit pollutants and exhaust. Inglese testified that he

had never seen any employee have to be off work or suffer respiratory problems or COPD due to exposure to diesel engines.

Captain David Ferreri learned of complaints about the air quality at station No. 3 in 2003. He hired an environmental engineer who discovered a minor amount of mold in the attic, which then was cleaned. Ferreri testified that a concern about a black contaminant found on an air filter at station No. 3 was also brought to his attention. A laboratory analysis of the substance on the filter showed no excessive mold growth. He did not have the filter tested for diesel exhaust, but no one at station No. 3 had complained to him about diesel fumes. Ferreri testified that the HVAC systems in station No. 3 are separate so that the exhaust from the apparatus floor where the diesel vehicles are parked cannot migrate to the firefighters' quarters.

Assistant Chief Richard Mikel testified that he was the training and safety officer for the Naperville Fire Department from 1995 to 2007. He received no complaints about diesel fumes at station No. 3. He testified that buildings involved in fire scenes must be thoroughly ventilated to eliminate smoke and gases from a fire before the firefighters are allowed to remove their SCBA. He further testified that turnout gear is laundered twice a year and an additional two times a year if there is significant exposure after a structure fire.

Plaintiff was examined by three physicians, chosen by the Board, who rendered written opinions and oral testimony. These physicians were Dr. Edward R. Garrity, professor of medicine and medical director of advanced lung disease, lung transplantation, and pulmonary and critical care medicine at the University of Chicago; Dr. Terrence C. Moisan, board certified in internal medicine, pulmonary disease, and occupational medicine at the Midwest Center for Environmental Medicine;

and Dr. David McElligott, board certified in internal medicine and pulmonary medicine in private practice specializing in pulmonary medicine and critical care.

In his written report, Dr. Garrity found that plaintiff was disabled, that his disability was not a result of sickness due to the performance of active duty or the cumulative effects of active duty, and that the cause of his disability was "tobacco abuse and use over many years." Dr. Moisan, in his written report, agreed that plaintiff was disabled. In response to the question "Is it medically possible that the applicant's injury/illness is a result of or caused by his or her line of duty or his or her service as a firefighter and/or officer?," Dr. Moisan checked the box "No." In answer to the question "Is the occupational disease disability resulting from service as a firefighter and/or paramedic?," Dr. Moisan checked the box "No." Dr. Moisan elaborated in a letter to the Board: "The cause of [plaintiff's] obstructive airways disease is clearly his cigarette smoking. The minimal potential exposures to which he may have had (structure fires) would have been a de-minimis risk for this degree of airway obstruction, given the fact that this patient does not have asthma (which may occur after a brief but intense exposure to pyrolysis products)."

Dr. McElligott also agreed that plaintiff was disabled. Dr. McElligott checked the "No" box when asked if plaintiff's disability resulted from the performance of an act of duty or from the cumulative effects of acts of duty. He similarly checked the "No" box when asked if plaintiff's occupational disease disability resulted from service as a firefighter and/or paramedic. Dr. McElligott's written findings included the following: "I believe [plaintiff] has advanced COPD due to smoking. I can detect no evidence on history, physical or record review that would suggest his problem is related to his occupational exposure."

At the hearing, Dr. Garrity testified that plaintiff "very, very likely" would have developed COPD even if he never were a firefighter, because of the early evidence of the disease and plaintiff's continued cigarette smoking. Dr. Garrity testified that a single or a recurrent exposure to toxic substances in fire smoke, even in the absence of cigarette smoking, could induce reactive airways disease—asthma—from which plaintiff did not suffer. According to Dr. Garrity, the ultimate cause of plaintiff's COPD was cigarette smoking. At the hearing, Dr. Moisan testified that the harmful substances present in smoke other than cigarette smoke would contribute to asthma but not to a cigarette-smoking-related disease. It was Dr. Moisan's opinion that plaintiff's clinical situation would not be materially different if he were not a firefighter. According to Dr. Moisan, the fire smoke that plaintiff breathed in connection with his duties as a firefighter would not have caused or permanently aggravated his COPD. Dr. Moisan also believed that any diesel fumes to which plaintiff may have been exposed neither caused nor permanently aggravated his COPD. Dr. McElligott testified at the hearing that the damage caused by exposure to the chemicals present in cigarette smoke, when encountered from a different source, might be totally different from the damage caused by those same chemicals when inhaled in cigarette smoke. Dr. McElligott's opinion was that plaintiff, with his smoking history, would be in the same condition if he had never been a firefighter. Dr. McElligott concluded within a reasonable degree of medical certainty that neither the fire smoke nor the diesel fumes that plaintiff may have breathed as a firefighter caused or contributed to his COPD.

On March 7, 2008, the Board denied plaintiff's request for line-of-duty benefits or occupational disease benefits but found that he was entitled to a non-duty pension under section 4—111 of the Code (40 ILCS 5/4—111 (West 2006)). It found that any alleged on-duty incidents or exposures did not cause or contribute to plaintiff's disability, which instead was caused by cigarette

smoking. The Board found that plaintiff's failure to make a reasonable effort to stop smoking, after medical advice to do so, was the ultimate cause of his disability.

On December 18, 2008, plaintiff filed a complaint for administrative review in the circuit court, and on December 17, 2009, the court affirmed the Board's decision. Plaintiff then filed this timely appeal.

ANALYSIS

Plaintiff raises two issues. He argues that he was entitled to a line-of-duty disability pension because all of the physicians agreed that cumulative acts of duty were a cause of his disability. In the alternative, he contends that the legislative findings in section 4—110.1 of the Code, combined with the evidence, entitled him to an occupational-disease disability pension. Section 4—110 provides for a line-of-duty pension if a firefighter, as the result of sickness, accident, or injury incurred in or resulting from the performance of an act of duty or from the cumulative effects of acts of duty, is found to be physically or mentally permanently disabled from service in the fire department. Section 4—110.1 provides that an active firefighter with five or more years of service who is unable to perform his duties by reason of heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract resulting from service as a firefighter is entitled to an occupational disease pension.

We first address the standard of review. Plaintiff contends that the correct standard of review is "clearly erroneous," while defendants assert that the standard of review is whether the Board's decision was against the manifest weight of the evidence. We review the decision of the administrative agency, not the trial court's decision. *Jones v. Board of Trustees of the Police Pension Fund*, 384 Ill. App. 3d 1064, 1067 (2008). The applicable standard of review depends upon whether the issue is one of fact, one of law, or a mixed question of law and fact. *Jones*, 384 Ill. App. 3d at

1067. We will reverse a ruling on a question of fact if it is against the manifest weight of the evidence. *Jones*, 384 Ill. App. 3d at 1067. We review questions of law *de novo* and mixed questions of law and fact under the "clearly erroneous" standard. *Jones*, 384 Ill. App. 3d at 1067. The examination of the legal effect of a given set of facts is what requires review under the "clearly erroneous" standard. *Jones*, 384 Ill. App. 3d at 1067. Here, in finding that plaintiff's disability was the result of cigarette smoking and that no on-duty incidents or exposures caused or contributed to his disability, the Board ruled on questions of fact. Accordingly, our review is whether the Board's decision was against the manifest weight of the evidence.

We first discuss plaintiff's contention that all of the physicians agreed that cumulative "acts of duty" were a "causal factor" of his disability. Plaintiff argues that, "boiled to their essence," the three medical opinions may be summarized as follows: (1) Dr. Garrity testified that plaintiff's occupational exposures to toxins in fire smoke and diesel exhaust cumulatively caused or accelerated his COPD; (2) Dr. Moisan testified that he could not exclude occupational exposures as a small contributing cause of plaintiff's COPD; and (3) Dr. McElligott testified that the cumulative effects of exposure to fire smoke and diesel exhaust could have accelerated plaintiff's COPD. Plaintiff relies on the rule in *Sisbro, Inc. v. Industrial Comm'n*, 207 Ill. 2d 193, 205 (2003), a workers' compensation case, where the court held that, even though an employee had a preexisting condition that may have made him more vulnerable to injury, recovery for an accidental injury would not be denied if it were shown that the employment was also a causative factor. Plaintiff urges that the same "a causative factor" analysis applies here. We need not decide whether to apply the rationale of workers' compensation law to the Code, as plaintiff invites us to do, because the appellate court has held that a line-of-duty pension may be awarded if the plaintiff proves that the exposure to smoke,

fumes, or some other condition of his employment exacerbated his condition of ill being. *Scalise v. Board of Trustees of the Westchester Firemen's Pension Fund*, 264 Ill. App. 3d 1029, 1033 (1993). The issue here is whether plaintiff proved that his employment exacerbated his COPD.

We must comment on plaintiff's brief. He premises his entire argument on the testimony of the three physicians, which was an extensive part of the record, yet his argument contains only one citation to the pages of the record relied on, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008). The appellate court is not a repository into which an appellant may foist the burden of argument and research. *Velocity Investments, LLC v. Alston*, 397 Ill. App. 3d 296, 297 (2010). We have the authority to hold that plaintiff forfeited his argument. *Velocity*, 397 Ill. App. 3d at 297. However, we choose to reach the issue in spite of plaintiff's disregard of the supreme court rule, as we understand the issue and the merits can be readily ascertained from the record. See *Velocity*, 397 Ill. App. 3d at 298. When we consider the entirety of the medical evidence, including the physicians' reports and their complete testimony, it is clear that plaintiff takes bits of testimony in isolation and out of context. The doctors' agreement that certain chemicals present in cigarette smoke are present elsewhere did not lead them to conclude, as plaintiff argues, that other alleged exposures caused or exacerbated plaintiff's COPD. Indeed, the doctors were unanimous in their opinions that the chemicals in cigarette smoke affect a person differently than the same chemicals encountered elsewhere and that plaintiff would be in the same clinical condition if he were never exposed to fire smoke or diesel fumes. Drs. Garrity and Moisan were particularly clear that exposure to fire smoke would cause asthma, not COPD; plaintiff did not have asthma; and plaintiff's COPD was caused by smoking cigarettes.

Plaintiff maintains that Dr. Moisan's opinion that plaintiff's exposure to fire smoke and diesel fumes caused a *de minimis* aggravation of his COPD was enough to prove his case because, he asserts, there is no exception for a *de minimis* causation. Plaintiff ignores Dr. Moisan's explanation of what he meant by the term "*de minimis*." Dr. Moisan testified that a *de minimis* aggravation was a transient one with no permanent effect.

Furthermore, we note that plaintiff's assumptions about his exposure to fire smoke and diesel fumes were mostly unproven. Plaintiff testified that throughout his career he responded to one fire monthly or bimonthly. Plaintiff also testified that he wore protective gear including a SCBA. There was testimony in the record that modern firefighters, because of their protective gear, are not as susceptible to the dangerous components of fire smoke as were their predecessors. Plaintiff altogether failed to prove that he was exposed to occupational diesel fumes. Although he testified that the vehicles were pulled into station No. 3 before the filters were attached, other unrebutted evidence showed that the exhaust was routed out of the building through a system separate from that which serviced the living quarters. There was evidence of an air quality problem at station No. 3, but no evidence of what caused it beyond testimony that mold was discovered and eradicated during a renovation. Moreover, plaintiff testified that his side job consisted of driving a diesel backhoe. Considering the entire record, and based upon the totality of the medical evidence, we cannot say that the Board's findings were against the manifest weight of the evidence.

Plaintiff's alternative contention is that the legislative findings in section 4—110.1, combined with the evidence, entitled him to an occupational-disease disability pension. We have already determined that the Board's finding that the evidence showed that plaintiff's COPD was not caused or exacerbated by an occupational exposure was not against the manifest weight of the evidence. The

question then becomes whether the legislative findings alone can provide the causal nexus. This is a question of law that we review *de novo*. *Jones*, 384 Ill. App. 3d at 1067. In enacting section 4—110.1 the legislature found:

> "[S]ervice in the fire department requires firefighters in times of stress and danger to perform unusual tasks; that firefighters are subject to exposure to extreme heat or extreme cold in certain seasons while performing their duties; that they are required to work in the midst of and are subject to heavy smoke fumes, and carcinogenic, poisonous, toxic, or chemical gases from fires; and that these conditions exist and arise out of or in the course of employment." 40 ILCS 5/4—110.1 (West 2006).

Courts are not empowered to adjudicate the accuracy of legislative findings, but must accord great deference to the legislature's fact-finding authority. *Empress Casino Joliet Corp. v. Giannoulias*, 231 Ill. 2d 62, 75 (2008). Consequently, we defer to the legislative findings in section 4—110.1.

Plaintiff argues that the legislative findings that firefighters are subject to the conditions described in section 4—110.1 amount to a legislative finding that these conditions cause a negative impact on a firefighter. He thus seeks to bootstrap the legislative findings into proof of causation. This argument is untenable because the legislature specifically provided that a firefighter subject to those conditions must prove that his or her disability resulted from service as a firefighter:

> "An active firefighter with 5 or more years of *** service who is found, pursuant to Section 4—112, unable to perform his or her duties in the fire department by reason of heart disease, stroke, tuberculosis, or any disease of the lungs or respiratory tract, *resulting from* service as a firefighter, is entitled to an occupational disease disability pension during any

period of such disability for which he or she has no right to receive salary." (Emphasis added.) 40 ILCS 5/4—110.1 (West 2006).

We, therefore, reject plaintiff's contention.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.