2022 IL App (1st) 220026
Opinion filed: December 8, 2022

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-0026

| | | |
|---|---|---|
| PRISCILLA VARGAS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| THE TOWN OF CICERO POLICE | ) | |
| PENSION FUND, THE BOARD OF | ) | No. 21 CH 00941 |
| TRUSTEES OF THE CICERO POLICE | ) | |
| PENSION FUND OF CICERO ILLINOIS, | ) | |
| and Its Members, JERRY CHLADA, | ) | |
| THOMAS KURATKO, ARTURO | ) | |
| DELAFUENTE, WILLIAM MADDEN, | ) | |
| and RICHARD TROJANEK, | ) | Honorable |
| | ) | Celia G. Gamrath, |
| Defendants-Appellees. | ) | Judge, presiding. |

JUSTICE ROCHFORD delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice Hoffman concurred in the judgment.

**OPINION**

¶ 1 Plaintiff, Priscilla Vargas, appeals the order of the circuit court that confirmed the decision of the Board of Trustees of the Cicero Police Pension Fund (the Board), denying her application for a surviving spouse's pension pursuant to sections 3-112(e) and 3-114.3 of the Illinois Pension Code (Code) (40 ILCS 5/3-112(e), 3-114.3 (West 2010)) based on the death of her husband, Samuel Vargas (Samuel), a Cicero police officer. We affirm the judgment of the circuit court.

¶ 2 The following factual recitation is taken from the evidence of record at the Board's hearing on plaintiff's application for pension benefits.

¶ 3 Samuel was born on July 1, 1973, and was 37 years old when he died on October 2, 2010. The Town of Cicero hired Samuel as a police officer on April 5, 1995, and he held the rank of patrol officer when he died. Plaintiff and Samuel were married at the time of his death.

¶ 4    In 2006, Samuel received medical treatment for a potential tuberculosis infection. Tests in connection with the treatment showed that Samuel had high blood pressure and an enlarged heart. He was described as "mildly obese."

¶ 5    Samuel was admitted to the hospital on February 15, 2007, for an undisclosed reason. Blood and urine tests revealed that he had a high cholesterol level of 223 mg/dL, compared to a normal range of 0 to 200 mg/dL.

¶ 6    On January 9, 2009, Samuel experienced a sudden onset of "burning anterior chest pain," after having had heartburn the previous day. He was transported to the hospital by emergency medical services (EMS) personnel at about 7:20 a.m. His blood pressure at 7:24 a.m. was 220/120.

¶ 7    Over the course of the next two hours, Samuel's chest pain decreased and his blood pressure dropped to 116/66. The emergency room doctor diagnosed him with chest pain and gastric reflux, with a differential diagnosis of esophageal reflux. Samuel was given a prescription for Pepcid and discharged with instructions to follow up with his doctor within three days.

¶ 8    Samuel visited Dr. Michelle Brannick at the Brannick Clinic of Natural Medicine 33 times from September 28, 2009, to September 30, 2010. At his first visit, Samuel reported cardiovascular palpitations and pain. His cholesterol level was high, at 226 mg/dL, and his blood pressure also was high, 160/108, and noted as a long-term condition. Dr. Brannick further noted that Samuel recently had gained 35 pounds and that he had discontinued using a prescribed medication for high blood pressure due to adverse side effects.

¶ 9    On October 29, 2009, Samuel returned to Dr. Brannick, who advised him to either lose weight or take prescription medication for his high blood pressure. Samuel decided not to take the medication and stated that he would work on his diet. His cholesterol was tested on September 23, 2010, and again found to be high, at 204 mg/dL.

¶ 10    In the three weeks before his death on October 2, 2010, Samuel complained to plaintiff that he was experiencing daily heartburn that was "getting worse."

¶ 11    On October 1, 2010, the day before his death, Samuel worked his regular 8 a.m. to 4 p.m. shift for the Cicero Police Department (Department) and responded to several calls. Patrick McGee, who was the Department's First Deputy Superintendent of Police, prepared a report on Samuel's activities on October 1. McGee spoke with Samuel's partner, Officer Frank Kane, who stated that they responded to a burglary in progress at 8:33 a.m. Kane saw Samuel engage in a "short but fast foot chase" with a subject but was unable to catch him. Samuel then "double backed" and found a second, juvenile subject hiding in a stairwell. The officers sent the subject back to school. Kane determined that no break-in actually occurred, and no burglary report was completed for the call.

¶ 12    At 9:58 a.m., Samuel responded to a call for suspicious activity, possibly a domestic disturbance, but the subjects were gone.

¶ 13    At 10:08 a.m., Samuel responded to a call and took a report from the victim of an armed robbery that had occurred the night before. At 11:07 a.m., Samuel performed further paper-work with respect to the armed robbery.

¶ 14    At 11:49 a.m., Samuel was one of eight officers who responded to a call for aggravated discharge of a firearm. He did not engage in any running or struggling on this call.

¶ 15    At 2:03 p.m., Samuel was one of five officers who responded to a suspicious subjects call, which turned out to be a couple who were looking for a place to "make out." The officers sent the couple back to school.

¶ 16    At 2:17 p.m., a hit and run was called in, and Samuel took the report.

¶ 17    At 3:05 p.m., a call came in for gang activity. Samuel responded and reported the subjects were gone on arrival.

¶ 18    Samuel arrived home around 4:15 p.m., ate dinner, and went outside to power wash a fence. Immediately after doing so, Samuel came in, sat down, began breathing heavily, and complained that he was very tired. He sat for about half an hour without moving. Plaintiff described him as pale and said that he "didn't look right." Samuel went to sleep by 9 p.m.

¶ 19    When plaintiff woke up at 5 a.m. on October 2, Samuel already was awake and showering, which was unusual because he usually was asleep at that time of the morning. Samuel told plaintiff that he was having trouble sleeping because he had a lot of heartburn. He did not eat breakfast, which also was unusual for him. Samuel's face was pale and plaintiff thought that he looked worse than the day before.

¶ 20    At 7:51 a.m., on October 2, 2010, Samuel was walking into the police station for roll call prior to his 8 a.m. shift. Samuel took two steps into the squad room and collapsed to the floor, unconscious. Department personnel immediately called Emergency Medical Services (EMS) and attempted to resuscitate him.

¶ 21    EMS personnel then arrived on the scene, took over the resuscitation attempts, and transported Samuel to the hospital. Samuel was pronounced dead at 8:34 a.m.

¶ 22    Dr. Adrienne Segovia performed the postmortem examination. Samuel's height at death was 5 feet, 9 inches and his weight was 246 pounds.

¶ 23    The internal examination revealed that Samuel's heart was enlarged. His left anterior descending coronary artery had "marked noncalcified atherosclerosis [the build-up of plaque inside the artery] with 75% to almost complete occlusion leaving a pinpoint lumen opening. Throughout the remainder of its course, there are areas up to 50% noncalcified atherosclerotic

lumen narrowing." Further, there were "areas of up to 50% noncalcified atherosclerotic lumen narrowing" throughout the course of Samuel's circumflex and right coronary arteries. Samuel's heart ventricles were dilated. The intima, or innermost layer, of his aorta had mild yellow/tan atherosclerotic plaque.

¶ 24    Dr. Segovia opined that Samuel "died as a result of coronary arteriosclerosis."

¶ 25    In connection with Samuel's death, plaintiff filed a claim for federal benefits pursuant to 42 U.S.C. § 3796(a) (2006) (now codified at 34 U.S.C. § 10281(a)), which provides benefits when "a public safety officer has died as the direct and proximate result of a personal injury sustained in the line of duty." Subsection (k) provides that a heart attack suffered by a public safety officer is presumed to constitute a personal injury sustained in the line of duty within the meaning of subsection (a), when the heart attack happens within 24 hours after he has engaged in nonroutine stressful or strenuous physical law enforcement. *Id.* § 3796(k).

¶ 26    As part of evaluating plaintiff's claim, the Department of Justice (Department) sent Samuel's medical records to Dr. Stephen J. Cina, a pathologist, who concluded that Samuel died of a heart attack at 7:51 a.m. on October 2, 2010, in the squad room. Dr. Cina wrote that Samuel's "heart attack was likely related to his hypertension [and] does not appear to be related to any of his on-the-job activities; it was a random event that could have happened at any time."

¶ 27    On September 18, 2015, the Department found that Samuel's death was covered under 42 U.S.C. § 3796 and that plaintiff and her children were entitled to benefits totaling $318,111.64.

¶ 28    Meanwhile, plaintiff began receiving benefits under section 3-112(c) of the Code (40 ILCS 5/3-112(c) (West 2010)), which provides that

"[u]pon the death of a police officer while in service, having at least 10 but less than 20 years of service, a pension of ½ of the salary attached to the rank or ranks held by the officer for one year immediately prior to death shall be payable to the survivors."

¶ 29    Plaintiff then filed for pension benefits under sections 3-112(e) and 3-114.3 of the Code (*id.* §§ 3-112(e), 3-114.3), which, if granted, would be greater than her section 3-112(c) benefits. Section 3-112(e) provides in pertinent part that the pension of the surviving spouse of a police officer who dies as a result of sickness, accident, or injury "incurred in or resulting from the performance of an act of duty" shall be 100% of his salary on his last day of service. *Id.* § 3-112(e). An "act of duty" is defined as:

"Any act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life, imposed on a policeman by the statutes of this State or by the ordinances or police regulations of the city in which this Article is in effect or by a special assignment; or any act of heroism performed in the city having for its direct purpose the saving of the life or property of a person other than the policeman." *Id.* § 5-113.

¶ 30    Section 3-114.3 states:

"Any police officer who suffers a heart attack or stroke as a result of the performance and discharge of police duty shall be considered as having been injured in the performance of an act of duty and shall be eligible for the benefits provided under this Article ***." *Id.* § 3-114.3.

¶ 31    Acting pursuant to section 3-115 of the Code (*id.* § 3-115), the Board requested that three physicians—Dr. Jason C. Robin, Dr. Asif Serajian, and Dr. Richard J. Carroll—review Samuel's

medical records and opine as to his cause of death and the relationship (if any) between his death and the performance of an act of duty.

¶ 32    Dr. Robin determined that Samuel died from a cardiac arrest on October 2, 2010, and that the most probable mechanism of the arrest was a ventricular arrhythmia (abnormal heart rhythm) due to ongoing ischemia (a restriction in the blood supply) from a very tight left anterior descending coronary artery lesion. The other possible mechanism is that Samuel had a massive anterior wall myocardial infarction (heart attack) on the morning of October 2, 2010, due to a new plaque rupture in the setting of previous atherosclerotic coronary disease, causing a new and worsening severe lesion in the left anterior descending coronary artery. Regardless of the precise mechanism of the cardiac arrest, the underlying etiology, or cause of death, was coronary arteriosclerosis, as stated by the medical examiner.

¶ 33    Dr. Robin noted that Samuel suffered from the preexisting conditions of high blood pressure, obesity, and obstructive coronary disease, and that his high blood pressure and obesity were contributors to his premature coronary disease, which in turn led to his death on October 2, 2010. Dr. Robin concluded that

> "[Samuel's] death was not a result of an act of duty. He was having angina [chest pain caused by reduced blood flow to the heart] the morning of October 2, 2010, prior to work and his cardiac arrest, which occurred during roll call, easily could have happened at home or while doing pedestrian activities."

¶ 34    Dr. Serajian determined that Samuel had a preexisting condition of hypertension and that his likely cause of death was a myocardial infarction involving the left anterior descending artery. Dr. Serajian concluded that Samuel's death "did not result from the direct performance of an 'Act

of duty,' although, he was involved in a call for a burglary less than 24 hours prior to his death where he was involved in physically strenuous activity which may have contributed to his death."

¶ 35 Dr. Carroll determined that the proximate cause of Samuel's death was "a sudden cardiac death, due to a cardiac arrythmia (a malignant, abnormal heart rhythm)," precipitated by his enlarged heart and advanced coronary artery disease. Dr. Carroll did not believe that Samuel died as a result of an act of duty, as he was simply walking into roll call at the time of his death.

¶ 36 Plaintiff obtained additional medical opinions from Dr. Behrooz Eshagy and Dr. Ravi Ramana.

¶ 37 Dr. Eshagy determined that Samuel was suffering from angina due to a 75% non-calcified stenosis (narrowing) in the left anterior descending artery, resulting in acute myocardial infarction and subsequent death. Dr. Eshagy opined that Samuel's "police activities" on October 1, 2010, were "contributing factors leading to his sudden cardiac death." Dr. Eshagy's opinion was based on "the circumstances of those activities as described in the reports, the proximity in time between those activities and [Samuel's] ultimate death."

¶ 38 Dr. Ramana determined that Samuel died of "coronary artery disease and sudden cardiac death likely due to his subtotal occlusion of the proximal left anterior descending." Dr. Ramana opined that due to his hypertension, high cholesterol, and obesity, Samuel's "fatal cardiac event may have been a random event that could have happened at any time and cannot be certainly correlated to his work activity on 10/1/2010." Dr. Ramana further opined, though, that "any physical exertion on 10/1/2010 *may* have contributed to inciting an acute fatal cardiac event in the setting of his underlying coronary artery atherosclerotic process." (Emphasis added.)

¶ 39 After receiving these reports from Dr. Eshagy and Dr. Ramana, the Board provided them to Drs. Robin, Serajian, and Carroll. Those doctors then provided supplemental reports.

¶ 40    Dr. Robin stated that Samuel had obstructive coronary disease dating back to January 2009, when he presented to the hospital with chest pain. The severe heartburn that Samuel complained of on the evening of October 1, 2010, the night before his death, was likely angina. Samuel did not complain of heartburn or chest pain while at work on October 1, 2010, and therefore Dr. Robin believed that his stenosis worsened that evening while at home and away from work duties. Dr. Robin opined:

> "Based on the constellation of events and the autopsy, it is my opinion that his event was 'random' and cannot be correlated to his work activity on October 1, 2010, or October 2, 2010. The driving force for his event was uncontrolled cardiac risk factors which were not managed with contemporary medicine."

¶ 41    Dr. Serajian and Dr. Robin each stated that upon review of Dr. Eshagy's and Dr. Ramana's reports, none of their original opinions had changed.

¶ 42    Following all the evidence, the Board issued its written decision denying plaintiff's application for a surviving spouse's pension under sections 3-112(e) and 3-114.3 of the Code. The Board began its analysis by considering whether plaintiff proved under section 3-112(e) that Samuel's fatal heart attack resulted from an act of duty. The Board correctly noted that other provisions of the Code also utilize the term "act of duty." Section 3-114.1 provides for disability benefits where the police officer's disability resulted from the performance of an "act of duty." See *id.* § 3-114.1. Sections 4-110 and 6-151 of the Code (*id.* §§ 4-110, 6-151) provide for disability benefits for firefighters where the firefighter's disability resulted from an "act of duty." In *Gatz v. Board of Trustees of the Village of Maywood Police Pension Fund*, 2019 IL App (1st) 190556, ¶ 29, a case involving the denial of benefits under section 3-112(e), the appellate court considered

case law construing the term "act of duty" in sections 3-114.1 and 6-151 when deciding whether the plaintiff had proved that the officer's death resulted from an act of duty.

¶ 43    The Board concluded from *Gatz* that when considering whether plaintiff proved that Samuel's death resulted from an act of duty so as to entitle her to a surviving spouse's pension under section 3-112(e), it may consider cases analyzing the term "act of duty" as used in the sections of the Code providing for disability pensions for police officers and firefighters.

¶ 44    The Board then cited two such cases—*Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485 (2007), and *Scepurek v. Board of Trustees of the Northbrook Firefighters' Pension Fund*, 2014 IL App (1st) 131066. *Wade* held that a disability pension under section 3-114.1 may be based on the aggravation of a preexisting condition while on duty. *Wade*, 226 Ill. 2d at 505. *Scepurek* held that a claimant for a disability pension under section 4-110 need not prove that the duty-related incident be the originating cause of injury, only a causative factor contributing to the disability. *Scepurek*, 2014 IL App (1st) 131066, ¶ 27.

¶ 45    The Board concluded from *Wade* and *Scepurek* that to recover a surviving spouse's pension under section 3-112(e), plaintiff was required to prove only that an act of duty by Samuel aggravated his preexisting heart condition, resulting in the heart attack that killed him. However, the Board also stated that plaintiff was not entitled to a surviving spouse's pension under section 3-112(e) merely by pointing to on-duty acts that *might* have aggravated his preexisting heart condition; she must prove an actual causal relationship between the act of duty and the aggravation of the preexisting condition.

¶ 46    The Board found *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494 (2011), to be instructive. In *Lindemulder*, the plaintiff, a firefighter, developed chronic obstructive pulmonary disease (COPD) and filed an application for disability

benefits under section 4-110 of the Code. *Id.* at 495. The plaintiff admitted that his cigarette smoking caused his COPD, but argued that he was entitled to disability benefits because his exposure to diesel fumes in the fire station and to fire smoke contributed to or exacerbated his COPD. *Id.* at 495-96. All three independent examining doctors concluded that the plaintiff's cigarette smoking alone caused his COPD. *Id.* at 498-99. The Board followed the medical evidence and denied the plaintiff's claim for disability benefits. *Id.* at 499.

¶ 47　　The appellate court noted that in finding that the plaintiff's COPD was the result of his cigarette smoking and that no act of duty incidents or exposures contributed to or exacerbated his COPD, the Board ruled on questions of fact that could not be reversed unless against the manifest weight of the evidence. *Id.* at 500. The appellate court found that the Board's reliance on the medical testimony was not against the manifest weight of the evidence and affirmed the denial of the plaintiff's claim for disability benefits. *Id.* at 502.

¶ 48　　In the present case, the Board found, as in *Lindemulder*, "extensive medical evidence" that Samuel's fatal heart attack was unrelated to any performance of an act of duty on October 1, 2010, and that no act of duty on that day aggravated or exacerbated his preexisting cardiovascular disease. Specifically, the Board noted Dr. Cina's finding that Samuel's heart attack likely was related to his hypertension and not to any of his on-the-job activities; Dr. Robin's finding that Samuel's preexisting high blood pressure and obesity were contributors to his premature coronary disease, which in turn led to his death on October 2, 2010, and Samuel's death not being a result of an act of duty nor correlated to his work activity on October 1, 2010; and Dr. Carroll's finding that Samuel's enlarged heart and advanced coronary heart disease were the precipitants of the malignant, abnormal cardiac rhythm that caused his heart attack and death, and that he did not die as a result of an act of duty on October 1.

¶ 49    Of the other three doctors, the Board noted that Dr. Eshagy was the only one who definitively opined that Samuel's "police activities" on October 1, 2010, were "contributing factors leading to his sudden cardiac death." Dr. Ramana and Dr. Serajian provided more equivocal opinions. Dr. Ramana noted that Samuel's physical exertion while performing his acts of duty on October 1, 2010, "may" have contributed to the fatal heart attack, but that—given his obesity, hypertension, and high cholesterol—the heart attack could have happened at any time even in the absence of such physical exertion. Dr. Serajian similarly opined that Samuel's preexisting hypertension and build-up of plaque in his left anterior descending artery contributed to the fatal heart attack, which was not the direct result of any physical exertion while performing an act of duty on October 1, 2010. Elsewhere in his opinion, though, Dr. Serajian opined that Samuel's physical exertion on October 1, 2010, while responding to the burglary call, "may" have contributed to the fatal heart attack.

¶ 50    The Board specifically found the "clear, well-reasoned opinions" of Dr. Chin, Dr. Robin, and Dr. Carroll to be "more persuasive" than the opinions of Dr. Eshagy, Dr. Ramana, and Dr. Serajian, and gave them "significant weight." The Board concluded that the clear progression of Samuel's cardiac disease, which led to his "fatal cardiac event," was "wholly unrelated to any act of duty" on October 1, 2010.

¶ 51    The Board next considered whether Samuel's walking into the squad room for roll call on October 2, 2010, at the time of his fatal heart attack, constituted the performance of an act of duty for which plaintiff could recover a surviving spouse's pension under section 3-112(e). The Board cited the finding in *Sarkis v. City of Des Plaines*, 378 Ill. App. 3d 833, 837 (2008), that "An officer does not perform an 'act of duty' merely by being on duty at the relevant time." See, *e.g.*, *Morgan v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 172 Ill. App. 3d 273, 276-77

(1988) (plaintiff not entitled to duty disability benefits for injury sustained when desk chair rolled out from under him as he completed a police report). The touchstone of an "act of duty" is the capacity in which the officer is acting (*Johnson v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 114 Ill. 2d 518, 522 (1986)) and whether his act involved a special risk imposed on him as a police officer and not ordinarily assumed by a citizen. The Board determined that Samuel's act of walking into the squad room for roll call at the time of his heart attack did not involve any special risk and was not an act of duty for which plaintiff could recover a surviving spouse's pension under section 3-112(e).

¶ 52     The Board next considered whether plaintiff could recover a surviving spouse's pension pursuant to section 3-114.3, which provides that a police officer who suffers a heart attack "as a result of the performance and discharge of police duty shall be considered as having been injured in the performance of an act of duty" (40 ILCS 5/3-114.3 (West 2010)), entitling his surviving spouse to pension benefits of 100% of the officer's salary under section 3-112(e). The Board determined—based on Samuel's history of heart disease and the "well-reasoned" opinions of Dr. Chin, Dr. Robin, and Dr. Carroll—that Samuel's heart attack was not the result of the performance and discharge of police duty. Therefore, Samuel could not be considered as having been injured in the performance of an act of duty for purposes of his surviving spouse receiving 100% of his salary under section 3-112(e). Accordingly, the Board denied plaintiff's claim for a surviving spouse's pension pursuant to sections 3-114.3 and 3-112(e).

¶ 53     Plaintiff timely filed a complaint for administrative review of the Board's decision in the circuit court of Cook County, which confirmed the Board's decision. This appeal followed.

¶ 54     On administrative review, we review the decision of the Board, not the determination of the circuit court. *Swanson v. Board of Trustees of the Flossmoor Police Pension Fund*, 2014 IL

App (1st) 130561, ¶ 27. We are obligated by statute to take all of the findings and conclusions of the Board as *prima facie* true and correct. *Id.* (citing 735 ILCS 5/3-110 (West 2010)). Our standard of review depends on the nature of the question addressed. *Id.* We review questions of law *de novo*. *Id.* We review questions of fact under a manifest weight standard. *Id.* We review questions of fact and law under a clearly erroneous standard. *Id.*

¶ 55    First, we address the Board's denial of plaintiff's claim for a surviving spouse's pension under section 3-112(e), based on her failure to prove that Samuel's fatal heart attack resulted from an "act of duty' involving a special risk. Second, we will address the Board's denial of plaintiff's claim for a surviving spouse's pension under section 3-114.3, based on her failure to prove that Samuel's fatal heart attack resulted from the performance of a "police duty."

¶ 56    Initially, we note that plaintiff has forfeited review of the Board's denial of a section 3-112(e) surviving spouse's pension based on her failure to prove that Samuel's fatal heart attack resulted from an act of duty involving a special risk, as she has not made any argument that Samuel's heart attack resulted from such an act of duty. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (requiring the appellant's brief to contain argument, with citations of authority and the pages of the record relied on).

¶ 57    Even if plaintiff had not forfeited review, we would affirm the Board. The issue of whether the Board erred in concluding that plaintiff failed to prove that Samuel's fatal heart attack was incurred in or resulted from the performance of an act of duty is a factual one reviewed under the manifest weight of the evidence standard. See *Gatz*, 2019 IL App (1st) 190556, ¶ 28. The Board's decision is against the manifest weight of the evidence only when the opposite conclusion is clearly evident. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 534 (2006).

¶ 58    *Gatz* is informative. In *Gatz*, the plaintiff was the surviving spouse of a police officer, Ryan Gatz. *Gatz*, 2019 IL App (1st) 190556, ¶ 1. The plaintiff alleged that Ryan died from a drug overdose as a result of post-traumatic stress disorder (PTSD) that he developed after an officer-involved shooting. She applied for a surviving spouse's pension under section 3-112(e). *Id.* ¶¶ 1-2.

¶ 59    The medical evidence was conflicting, as two doctors opined that Ryan's overdose was an accident unrelated to the shooting, while two other doctors opined that the shooting caused Ryan to suffer PTSD, leading him to take the drugs that killed him. *Id.* ¶¶ 12, 15-19. The Board denied the plaintiff's application for a surviving spouse's pension under section 3-112(e), expressly relying on the doctors who opined that Ryan's death was accidental. *Id.* ¶ 20.

¶ 60    On appeal, this court affirmed, noting that it was the Board's function to resolve the factual dispute regarding the cause of Ryan's death and that the Board's decision denying the plaintiff a surviving spouse's pension under section 3-112(e) was not against the manifest weight of the evidence. *Id.* ¶ 33.

¶ 61    Similarly, in the present case, the Board was called upon to resolve the factual dispute regarding the cause of Samuel's heart attack and death. Dr. Eshagy opined that Samuel's physical exertion while performing acts of duty involving a special risk on October 1, 2010, was a contributing factor to his fatal heart attack. Dr. Serajian and Dr. Ramana gave opinions indicating that Samuel's physical exertion when performing such acts of duty on October 1, 2010, *may* have been a contributing factor to his fatal heart attack, although they could not say for certain given his history of hypertension, obesity, and high cholesterol. By contrast, Dr. Cina, Dr. Robin, and Dr. Carroll definitively opined that Samuel's fatal heart attack was due to his preexisting obstructive coronary disease, exacerbated by his obesity and high blood pressure, and did *not* result from his

physical exertion while performing any act of duty involving any special risk. The Board expressly found Dr. Cina's, Dr. Robin's, and Dr. Carroll's opinions to be "more persuasive" than the opinions of Dr. Eshagy, Dr. Ramana, and Dr. Serajian, and it found that Samuel's heart attack and death did not result from the performance of an act of duty involving a special risk. The Board's finding was not against the manifest weight of the evidence. Accordingly, we affirm the Board's denial of plaintiff's claim for a surviving spouse's pension under section 3-112(e).

¶ 62     Next, we address the Board's denial of plaintiff's claim for a surviving spouse's pension under section 3-114.3. Plaintiff argues that the Board applied the wrong standard when denying her section 3-114.3 claim, as it improperly required her to show that Samuel's heart attack and death were the result of an "act of duty," *i.e.*, "[a]ny act of police duty inherently involving special risk, not ordinarily assumed by a citizen in the ordinary walks of life." 40 ILCS 5/5-113 (West 2010). Plaintiff argues that unlike section 3-112(e), section 3-114.3 only required her to show that Samuel suffered his fatal heart attack in "the performance and discharge of police duty" (*id.* § 3-114.3), even one that did not involve special risk.

¶ 63     The construction of section 3-114.3 is a question of law reviewed *de novo*. *Eighner v. Tiernan*, 2020 IL App (1st) 191369, ¶ 9. The fundamental rule of statutory construction is to effectuate the intent of the legislature, the best indicator of which is the statutory language, given its plain and ordinary meaning. *Id.* Where the language is clear and unambiguous, we apply the statute without resort to further aids of statutory construction. *Id.*

¶ 64     Courts liberally construe pension acts to favor the rights of the pensioner. *Johnson*, 114 Ill. 2d at 521. However, " 'if the legislative intention is obvious from the language used[,] that intention must be made effective, and the judiciary will not be warranted in giving the act a meaning not expressed in it.' " *Robbins v. Board of Trustees of the Carbondale Police Pension*

*Fund of Carbondale*, 177 Ill. 2d 533, 545 (1997) (quoting *Sup v. Cervenka*, 331 Ill. 459, 463 (1928)).

¶ 65    Section 3-114.3 clearly and unambiguously states that

"[a]ny police officer who suffers a heart attack *** as a result of the performance and

discharge of police duty shall be considered as having been injured in the performance of

an act of duty and shall be eligible for the benefits provided under this Article for police

officers injured in the performance of an act of duty." 40 ILCS 5/3-114.3 (West 2010).

Section 3-114.3 contains no modifier preceding or in any way limiting the scope of the term "police

duty." Thus, any police officer who suffers a heart attack as the result of the performance and

discharge of *any* police duty (regardless of its level of risk) is considered as having been injured

in the performance of an act of duty and his surviving spouse is eligible for the benefits provided

in section 3-112(e).

¶ 66    Plaintiff contends that she met her burden of proving that Samuel was performing a police

duty at the time of his fatal heart attack because she showed that his heart attack occurred as he

was reporting for roll call 10 minutes before the start of his shift pursuant to the Cicero Police

Department's Standard Operating Procedure #14-001. Plaintiff further argues that pursuant to

section 3-114.3, the fatal heart attack occurring during the performance of police duties is

considered *as if* it occurred during the performance of an "act of duty" involving special risk,

making her eligible to receive pension benefits equal to 100% of Samuel's salary under section 3-

112(e). However, under the clear and unambiguous language of section 3-114.3, the surviving

spouse of a police officer who suffers a fatal heart attack is only entitled to the survivor benefits

under section 3-112(e) when the officer suffers the heart attack "as a *result* of the performance and

discharge of police duty." (Emphasis added.) *Id.* "A thing 'results' when it '[a]rise[s] as an effect,

issue, or outcome from some action, process, or design.' 2 The New Shorter Oxford English Dictionary 2570 (1993). 'Results from' imposes, in other words, a requirement of actual causality." (Emphasis omitted.) *Burrage v. United States*, 571 U.S. 204, 210-11 (2014).

¶ 67    In the present case, review of the Board's written order shows that it relied on the opinions of Dr. Chin, Dr. Robin, and Dr. Carroll, in determining that Samuel's fatal heart attack did not result from the performance and discharge of a policy duty, either on October 1, when he responded to several calls for help, or on October 2, when he walked into the police station for roll call. Instead, Samuel's fatal heart attack resulted from his preexisting cardiac disease, exacerbated by his obesity and high blood pressure. Accordingly, the Board denied plaintiff's claim for a surviving spouse's pension under section 3-114.3.

¶ 68    The question of whether the evidence supports the Board's finding that plaintiff failed to prove that Samuel's fatal heart attack was the result of the performance of a police duty is one of fact, and the Board's determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. See *Swanson*, 2014 IL App (1st) 130561, ¶¶ 30-31.

¶ 69    *Swanson*, 2014 IL App (1st) 130561, is informative. In *Swanson*, the plaintiff, a detective in the Flossmoor police department, left home to go to work on July 31, 2009, but returned shortly thereafter, complaining that his arm was numb and his lip was drooping. *Id.* ¶ 4. The plaintiff's wife drove him to the hospital, where he was diagnosed with an unspecified cerebral arterial occlusion with cerebral infarction (*i.e.*, an ischemic stroke). *Id.*

¶ 70    The plaintiff filed an application for disability benefits with the Board, seeking a pension under section 3-114.3 for having suffered a stroke while performing a police duty. *Id.* ¶ 16. There was conflicting medical evidence regarding the etiology of the stroke. Dr. Richard Munson opined that there was " 'no evidence' " that the plaintiff's stroke was the result of the performance of any

police duty. *Id.* ¶ 31. Dr. Michael Schneck opined that there was an association between the plaintiff's performance of his police duties and his subsequent stroke. *Id.* The Board found Dr. Munson's opinion credible and relied on it when finding that the plaintiff had failed to prove that his stroke was caused by his performance of his police duties. *Id.* The appellate court held that the Board's denial of the plaintiff's application for a pension under section 3-114.3 was not against the manifest weight of the evidence as it was supported by the opinion of Dr. Munson. *Id.* ¶¶ 31, 33.

¶ 71 Similarly, in the present case, there was conflicting medical evidence regarding the etiology of Samuel's fatal heart attack. Dr. Eshagy definitively opined that Samuel's performance of his duties as a police officer on October 1, 2010, was a contributing factor in his fatal heart attack. Dr. Ramana and Dr. Serajian opined that Samuel's performance of those police duties may have contributed to his fatal heart attack, but that they could not say for certain, given his history of hypertension, obesity, and high cholesterol. Dr. Cina, Dr. Robin, and Dr. Carroll opined that Samuel's heart attack was unrelated to his performance of any duties as a police officer and, instead, was caused solely by his underlying cardiac disease exacerbated by his obesity and high blood pressure. The Board expressly found the opinions of Dr. Cina, Dr. Robin, and Dr. Carroll to be well-reasoned and "more persuasive" than the contrary opinions of Dr. Eshagy, Dr. Ramana, and Dr. Serajian and determined that Samuel's heart attack was not the result of his performance of any police duties. As it was the Board's function to resolve the factual dispute, and the record contains sufficient evidence supporting the Board's finding that Samuel's fatal heart attack was not the result of the performance of a police duty, we cannot say that the denial of plaintiff's application for a surviving spouse's pension under section 3-114.3 was against the manifest weight of the evidence.

¶ 72     For all the foregoing reasons, we affirm the judgment of the circuit court that confirmed

the Board's decision in this case.

¶ 73     Affirmed.

*Vargas v. Town of Cicero Police Pension Fund*, **2022 IL App (1st) 220026**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-CH-00941; the Hon. Celia G. Gamrath, Judge, presiding. |
| **Attorneys for Appellant:** | Peter M. DeLongis, Joseph L. Ponsetto, and Daniel T. Gillespie, of Law Offices of Peter M. DeLongis, Ltd., of Oakbrook Terrace, for appellant. |
| **Attorneys for Appellee:** | Jerry J. Marzullo, of Asher, Gittler & D'Alba, Ltd., of Chicago, for appellees. |